Adrienne LEFKOWITZ,
Plaintiff–Appellant,

v.

ARCADIA TRADING CO. LTD. BENEFIT PENSION PLAN, Bay Novelty and Inspection Company Limited Defined Benefit Pension Plan, Bonus Consultants Limited, Committee of the Arcadia Trading Company Limited Defined Benefit Pension Plan, Committee of the Bay Novelty and Inspection Company Limited Defined Benefit Pension Plan, and The Bank of New York as Preliminary Executor of the Estate of Irene B. Marsh, Defendants–Appellees.

No. 820, Docket No. 92–9030.

United States Court of Appeals,
Second Circuit.

Argued Jan. 6, 1993.

Decided June 22, 1993.

Mitchell L. Strickler, Washington DC, for plaintiff-appellant.

Robert M. Redis, White Plains, NY (Frank W. Streng, Howell Bramson, William F. Macreery, Robert H. Rosh, and McCarthy, Fingar, Donovan, Drazen & Smith, of counsel), for defendant-appellee The Bank of New York as Preliminary Executor of Estate of Irene B. Marsh.

Millbank, Tweed, Hadley & McCloy, New York City, for defendants-appellees Arcadia Trading Co. Ltd. Ben. Pension Plan, Bay Novelty and Inspection Co. Ltd. Defined Ben. Pension Plan, Bonus Consultants Ltd., Committee of Arcadia Trading Co. Ltd. Defined Ben. Pension Plan, Committee of Bay Novelty and Inspection Co. Ltd. Defined Ben. Pension Plan.

Before: PRATT and MAHONEY, Circuit Judges, and DANIEL M. FRIEDMAN, Circuit Judge for the United States Court of Appeals for the Federal Circuit, sitting by designation.

GEORGE C. PRATT, Circuit Judge:

In 1984 congress amended the Employee Retirement Income Security Act ("ERISA") with the Retirement Equity Act ("REA"), Pub.L. 98–397, 98 Stat. 1426 (1984), *codified*

*at* 29 U.S.C. §§ 1052–1056, to ensure that individuals whose spouses die before their retirement would nevertheless receive the spouses' pension benefits. As we recently noted in *Hurwitz v. Sher,* 982 F.2d 778, 781 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2345, 124 L.Ed.2d 255 (1993), the statute is intended to protect "long-term homemakers' rights to their spouses' retirement benefits".

Plaintiff Adrienne Lefkowitz appeals from a summary judgment of the United States District Court for the Southern District of New York, Robert J. Ward, *Judge,* in favor of the Bank of New York as Preliminary Executor of the Estate of Irene Marsh ("the estate"). The district court concluded that the estate was entitled to benefits from two pension plans that had covered Nicholas V. Marsh, Irene's husband. The district court held that the REA applied to these pension plans and, because Irene had not waived her REA-established rights, her estate was entitled to the benefits.

Adrienne Lefkowitz—daughter of Nicholas and Irene—principally claims on appeal that the REA does not apply to these pension plans and, because her father had designated her as sole beneficiary of the plans, that she is entitled to the pension benefits. For the reasons set forth below we affirm the judgment in favor of the estate of Nicholas's widow.

## BACKGROUND

This case arises from a bitter mother-daughter dispute between Irene and Adrienne over Nicholas's pension benefits.

### A. *The Pension Plans.*

The Marsh Family—Nicholas, Irene, and their three children—controlled two Hong Kong corporations, Arcadia Trading Company ("Arcadia") and Bay Novelty and Inspection Company ("Bay Novelty"), which specialized in the export and inspection of artificial flowers. Both corporations employed Nicholas, a United States citizen and resident of New York, and in 1980 adopted defined benefit pension plans with Nicholas as their only participant. In January 1983 the IRS determined that each pension plan qualified for various tax advantages under 26 U.S.C. § 401 and § 501.

In May 1983 Nicholas and Irene executed mutual wills and simultaneously entered into an agreement which provided that neither party would "revoke his or her Will" or "execute a new Will, a codicil or a trust agreement disposing of his or her property at death". Three years later, Irene and Nicholas experienced a falling-out, which led Irene to initiate divorce proceedings in January 1987. In April 1987 Nicholas signed two beneficiary designation forms that named Adrienne as the sole beneficiary of the pension plans. Needless to say, Irene did not consent to this designation. Four months later, Nicholas commenced his own divorce proceeding, claiming that Irene had abandoned him. When Nicholas died on March 15, 1988, he and Irene were estranged, but it is undisputed that they were still married. Nicholas's death triggered a struggle over the pension benefits. In a related case, widow Irene in February 1990 commenced a turnover proceeding in New York County surrogate's court seeking payment of the benefits to her. Relying on 28 U.S.C. § 1441(a), daughter Adrienne on March 14, 1990, removed the case to the United States District Court for the Southern District of New York, where it was assigned to Hon. Kevin Thomas Duffy, *Judge.* On April 6, 1990, Adrienne filed this action, which was also assigned to Judge Duffy, seeking the pension-plan benefits for herself, based on Nicholas's 1987 designation of her as his sole beneficiary under the plans. The two cases were never consolidated. Irene died on May 13, 1990, and the Bank of New York represents her estate in this action.

In ruling on the parties' cross-motions for summary judgment, Judge Duffy concluded that ERISA in general and the REA in particular applied to Nicholas's pension plans; that the REA conferred a Qualified Preretirement Survivor Annuity (QPSA) upon Irene; and that since Irene had never waived her right to the benefits, she was entitled to the QPSA notwithstanding Nicholas's designation in 1987 of Adrienne as his

beneficiary. *In re Lefkowitz*, 767 F.Supp. 501 (S.D.N.Y.1991).

Judge Duffy then referred the matter to Magistrate Judge Kathleen A. Roberts to determine the amount of the QPSA to be paid to the Bank of New York. Magistrate Judge Roberts addressed the QPSA matter in a report and recommendation dated June 23, 1992.

Based on Judge Duffy's memorandum and order and Magistrate Judge Roberts' report and recommendation, the district court on August 18, 1992, entered judgment (1) declaring ERISA applicable to the pension plans; (2) denying Adrienne's motion for partial summary judgment and dismissing her complaint; (3) granting the estate's motion for partial summary judgment; (4) determining that the estate was entitled to a QPSA of $2,178,432; and (5) awarding costs against Adrienne under Fed.R.Civ.P. 54(d).

Adrienne now appeals, contending (1) that title I of ERISA, which contains the REA, does not apply to the plans because they were maintained by foreign corporations; and (2) that the REA does not apply because the corporations did not amend the pension plans to provide QPSAs.

## DISCUSSION

■ We review the district court's grant of summary judgment *de novo, see Burtnieks v. City of New York*, 716 F.2d 982, 985 (2d Cir.1983), drawing all inferences in favor of Adrienne, the losing party.

### A. *ERISA Applies to the Pension Plans.*

■ Adrienne first asserts that summary judgment was improper because there are genuine issues of material fact over whether these plans are covered by title I of ERISA, *see* 29 U.S.C. §§ 1001–1461, which contains the REA. Title I imposes obligations on pension-plan fiduciaries and applies only to those plans that are maintained "by any employer engaged in commerce or in any industry or activity affecting commerce". 29 U.S.C. § 1003(a)(1). Plans "maintained outside of the United States primarily for the benefit of persons substantially all of whom are nonresident aliens" are exempt from cov-

erage. 29 U.S.C. § 1003(b)(4). Adrienne argues that because Hong Kong corporations established these plans, there is a genuine issue of material fact as to whether the plans are affected by ERISA.

The district court correctly noted that since Nicholas was an American citizen the plans did not qualify for the § 1003(b)(4) exemption. While the district court did not address the interstate commerce issue, our review of the record shows that there is no genuine issue of material fact as to whether the corporations were engaged in commerce. There is evidence, including letters from the corporations' directors, that refers to the corporate business as providing "inspection services in connection with the supply of artificial flowers and flower arrangements to the USA." While Arcadia and Bay Novelty do not conduct their business in the United States, this does not determine whether the corporations affect United States commerce. Clearly they do, because their principal markets are in this country. Adrienne fails to raise any genuine issue as to this element.

### B. *The REA Applies to Unamended Pension Plans.*

■ Although contributions to the pension plans were terminated on December 31, 1984, Judge Duffy concluded that the plans themselves had not terminated for the purposes of REA applicability. *In re Lefkowitz*, 767 F.Supp. at 508–09. Thus, the question is whether the REA applies to pension plans that have not been amended to provide for QPSAs. The REA provides in relevant part:

> *Each pension plan* to which this section applies *shall provide that* —
>
> \*    \*    \*    \*    \*    \*
>
> (2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

29 U.S.C. § 1055(a)(2) (emphasis added).

Congress enacted the REA on August 24, 1984, but provided that the statute would not be effective until after December 31, 1984.

Nevertheless, it enacted a transitional rule, § 303(c)(2), that provided in relevant part:

In the case of any participant—

(A) who has at least 1 hour of service under the plan on or after the date of the enactment of this Act or has at least 1 hour of paid leave on or after such date of enactment,

(B) who dies before the annuity starting date, and

(C) who dies *on or after the date of the enactment of this Act and before the first day of the first plan year to which the amendments made by this Act apply,*

the amendments made by sections 103 and 203 shall be treated as in effect as of the time of such participant's death.

Pub.L. 98–397, Title III, § 303(c)(2) (emphasis added).

Thus, the transitional rule applied the QPSA provisions to pension plans where a plan participant died after August 24, 1984, the day of enactment, but before the first day of the first plan year that began after December 31, 1984. The relevant treasury regulation indicates that in such cases the REA will apply even where the plan was not amended to comply with the statute:

Q–42: Must a plan be amended to provide for the QPSA required [by the transition rule]?

A–42: A plan will not fail to satisfy the qualification requirements of [the transition rule] merely because it is not amended to provide a QPSA [required by the transition rule]. *The plan, however, must satisfy those requirements in operation.*

26 C.F.R. § 1.401(a)–20 (1992) (emphasis added).

The district court relied on this "transition rule" in reaching its conclusion that the REA applied to the pension plans in this case, notwithstanding Arcadia and Bay Novelty's failure to amend the plans in compliance with the statute. While the district court's ultimate conclusion was correct, it erred when it applied the transitional rule directly to the plans in this case. For these plans, the relevant plan year began on March 1, 1985. Thus, the transitional rule would apply only

if Nicholas had died between August 24, 1984, and March 1, 1985, the first day of the first plan year after the effective date of the act. Nicholas, however, died in 1987; thus, Adrienne correctly argues, the transitional rule does not directly apply to the plans in this case. Any other reading would turn the transitional rule into a permanent rule.

Adrienne further contends that the REA does not apply because the pension plans were not amended to comply with the REA. From the statutory provision that "[e]ach pension plan * * * shall provide" for a QPSA, she would infer that compliance by any particular plan with the REA is optional. We disagree.

First, Adrienne's reading of the statutory language is flawed. "[M]uch of the trouble in statute drafting originates in the use of *shall.*" Bryan A. Garner, *A Dictionary of Modern Legal Usage* 516 (1987). As Professor Garner notes, "[t]he word *shall* ordinarily connotes language of command". *Id.* at 502. Adrienne, however, would read the word "shall" as if it did not command an obligation. Under her interpretation, the REA would automatically apply via the transitional rule to unamended pension plans where a participant dies *before* the first day of the first plan year after the statute's effective date, but would apply in all other circumstances only if the plans themselves formally adopted the REA's QPSA provisions.

Reading the statute as a whole, we are satisfied that congress intended the QPSA provisions of the REA to be mandatory, not optional. The transitional rule was designed to provide immediate protection for spouses of participants who might die soon after the statute was enacted. This concern for immediate protection upon enactment, notwithstanding that the other provisions of the amendment had a delayed effective date, indicates that congress clearly did not intend that the REA could be accepted or rejected at the discretion of pension plan administrators.

Second, experts in the field believe that the QPSA benefit is automatic "unless it is specifically and effectively waived". Ronald J. Cooke, *ERISA Practice and Procedure*

§ 4.44, at 4–136 (1992); *see also* Research Institute of America, *Pension Coordinator* ¶ 51,040 (1993) (QPSA required whether or not plan seeks tax qualification).

Third, the statute that confers federal jurisdiction over this matter permits a plan beneficiary, such as a spouse claiming an entitlement to a QPSA, to seek judicial enforcement of a benefit conferred by ERISA. A plan beneficiary may bring a civil suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) *to enforce any provisions of this subchapter* or the terms of the plan." 29 U.S.C. § 1132(a)(3) (emphasis added). *See also Massachusetts Laborers' Health & Welfare Fund v. Starrett Paving Corp.*, 845 F.2d 23, 27 (1st Cir.1988) (statute permits plan beneficiary "to enforce a plan's terms or to enforce other, substantive provisions" of ERISA).

Finally, REA's legislative history also demonstrates congress's intent to ensure the mandatory application of REA to pension plans. Congress felt it was "inequitable" for a participant's spouse to receive "no survivor benefits under the plan even though the participant had accrued significant vested benefits before death. Therefore, * * * it is appropriate to provide automatic survivor benefits to the spouses of vested participants." S.Rep. No. 98–575, 98th Cong., 2d Sess. 12 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2547, 2558; *see also Hurwitz*, 982 F.2d at 781. This desire to benefit spouses of pension plan beneficiaries implies an intent to apply the REA to pension plans whether or not they were amended to provide a QPSA, because to hold otherwise would permit recalcitrant administrators of pension plans to avoid providing spousal benefits simply by declining to amend their plans after the transitional rule expired.

We conclude that the district court properly determined that the automatic QPSA provisions of the REA applied to these pension plans. Since it is undisputed that Irene did not consent to Nicholas's 1987 designation of Adrienne as the beneficiary, *see* 29 U.S.C. § 1055(c)(2); *see also* Cooke, *supra*, § 4.44, her estate is entitled to the QPSA.

Affirmed.

MAHONEY, Circuit Judge, concurring:

I concur in the opinion of the court. I write separately only to note that the operation of the transitional rule, § 303(c)(2) of the REA, lends additional support to the court's ruling. The transitional rule provides that as to certain participants who died after the enactment of the REA but before it became effective as to the plan covering that participant (i.e., before the first plan year commencing after December 31, 1984), "the amendments made by sections 103 and 203 shall be treated as in effect as of the time of such participant's death." Section 103 of the REA enacted amended § 1055 of title 29, the ERISA provision at issue in this case, and section 203 enacted the counterpart provisions of the Internal Revenue Code.

Unless, however, § 1055 acts automatically to *effect* the amendment requiring QPSAs in pension plans subject to § 1055, the fact that § 1055· was "in effect" at the time of the death of a participant to whom the transitional rule applied would ordinarily be meaningless, since no plan amendment would normally have been adopted at that premature juncture.

It nonetheless seems to me somewhat extraordinary to rule that a statute which requires that pension plans "shall provide" for QPSAs has the effect of injecting the required provisions into covered plans whether or not the provisions are ever actually adopted and incorporated into the plans. Reading § 1055 in context, however, this appears to be what Congress intended, and I therefore join in the ruling that this is what Congress enacted.