RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0189P (6th Cir.)
File Name: 03a0189p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

GAYLE D. SHIELDS,
     *Plaintiff-Appellant,*

     *v.*

READER'S DIGEST
ASSOCIATION, INC.;
RETIREMENT PLAN; LISA
CRIBARI; CLIFFORD DUPREE;
JOHN GIMBLETTE; BARRY
LIEBMAN; GARY RICH;
GEORGE SCIMONE,
     *Defendants-Appellees.*

No. 01-2118

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 99-72555—Julian A. Cook, Jr., District Judge.

Submitted: February 7, 2003

Decided and Filed: June 9, 2003

Before: SILER and ROGERS, Circuit Judges; GWIN,
District Judge.[*]

---

[*] The Honorable James S. Gwin, United States District Judge for the Northern District of Ohio, sitting by designation.

## COUNSEL

**ON BRIEF:** Donald R. Bachand III, GARRATT & BACHAND, Bloomfield Hills, Michigan, for Appellant. Peter L. Simmons, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for Appellees.

## OPINION

SILER, Circuit Judge. Plaintiff Gayle D. Shields filed a cause of action in an effort to recover survivor benefits under her deceased husband's retirement plan. She brought her claims against QSP, Inc., the Reader's Digest Association, Inc. ("Reader's Digest"), the Reader's Digest Association, Inc. Retirement Plan (the "Plan"), and the individual members of the Employee Benefits Committee that administered the Plan at the time Plaintiff made her claim, namely, Lisa Cribari, Clifford DuPree, John Gimblette, Barry Liebman, Gary Rich and George Scimone (hereinafter, the Plan and the individual defendants of the Employee Benefits Committee will be collectively referred to as "Defendants").[1] Following a bench trial, the district court rejected Plaintiff's factual and legal challenges to the benefits election and waiver forms submitted by Plaintiff and her husband. On appeal, Plaintiff argues that the district court erred in its legal conclusion that the waiver form was not defective due to issues relating to the timeliness of its submission. We disagree and therefore **AFFIRM** the judgment of the district court.

---

[1] The corporate defendants, Reader's Digest and QSP, Inc., were dismissed as improper parties. That dismissal has not been appealed.

## I.    BACKGROUND

Plaintiff is the widow of Joseph R. Shields ("Mr. Shields"), a former long-term employee of QSP, Inc., which is a subsidiary of Reader's Digest. The Plan, which is subject to the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*, is a retirement plan for the benefit of employees and former employees of Reader's Digest and certain of its subsidiaries, including QSP. Mr. Shields retired from QSP as a participant in the Plan and hence was entitled to elect one of several pension benefit options, all of which are designed to be of equal actuarial value.

Under the Plan, the normal age of retirement is 65. An employee may elect to retire early, however, if he or she is (1) at least 60 years old or (2) at least 55 years old and his or her age plus his or her years of service equals 70. A participant electing early retirement may choose from any of the available benefit options, although the payment levels are actuarially adjusted to reflect the longer time period over which the benefits will be paid.

One option is a "life annuity benefit," under which the retiree typically receives a fixed monthly sum paid for the rest of his or her life, but a surviving spouse receives no benefits for the balance of the spouse's life.[2] Two other available pension options are "joint and survivor benefits." Under these options, the retiree receives a monthly payment for the duration of his or her life, and if the retiree predeceases his or her spouse, the surviving spouse receives continued benefits for the balance of the spouse's life.[3] In accordance with

---

[2] A retiree will typically receive a higher monthly payment under the life annuity option than under either of the joint and survivor options because under the latter options, the payments are likely to continue for a longer period of time because of the survivor benefits component.

[3] The two options are "joint and 100% survivor" and "joint and 50% survivor." Under the joint and 100% survivor approach, the surviving spouse continues receiving monthly payments in the same amount as was

federal law, *see* 29 U.S.C. § 1055(a)(1), the default pension option available to married retirees under the Plan is the "Qualified Joint and Survivor Annuity" ("QJSA"). Under the terms of this option, amortized benefits are paid directly to the eligible retiree and, upon his or her death, one half of the remaining benefits are paid to the surviving spouse for the duration of his or her life. Although Plan participants are entitled to choose any of the available options, certain elections require spousal consent. For example, to select the life annuity benefit, a married participant must submit a QJSA waiver form signed by his or her spouse and notarized by a notary public. By executing this form, the spouse consents to waiving survivor benefits in exchange for higher payments to the retiree during the retiree's lifetime.

Many of the day-to-day administrative functions of the Plan are handled by an outside servicing company, William M. Mercer, Inc. ("Mercer"), which performs the actuarial benefit calculations, processes the benefit paperwork, and fields telephone inquiries. In order to receive benefits, a retiring employee must notify the Plan of his or her intent to retire and request the appropriate paperwork from Mercer. Mercer then makes the necessary calculations to determine the benefits owed to the employee and sends the appropriate paperwork to the employee.

On December 9, 1997, Mercer sent Mr. Shields a letter indicating the different benefit options available to him if he were to retire as of January 1, 1998. The letter stated that the default pension payment for a married participant is the QJSA, and that a different benefit option may require spousal consent. The letter specifically stated that to select a payment other than the QJSA, "the election must be made prior to benefits commencing but not earlier than 90 days before your benefit payments can begin." Accompanying the letter were the many necessary forms that required completion and

---

paid to the retiree. Under the joint and 50% survivor approach, the surviving spouse's monthly payment is fifty percent of what the retiree was receiving.

return, as well as a chart indicating the different payments Mr. Shields and Plaintiff would receive each month under each of the available options.

On January 1, 1998, at the age of 62, Mr. Shields retired from QSP after more than thirty years of service. As an early retiree, he could have deferred receiving pension payments until the age of 65. In other words, the Plan would accept Mr. Shields's decision to begin receiving pension benefits at any time during this approximately three-year window and would begin payments at the next available date after the required paperwork was submitted.

Mr. Shields submitted his retirement forms--all dated January 21, 1998--to Mercer. Among the forms returned were an option election form specifying his selection of the life annuity benefit, and a QJSA waiver form bearing the signature "Gayle D. Shields," terminating the Plaintiff's rights under the default QJSA option. On approximately January 22, 1998, the Plan approved payment of benefits to Mr. Shields *retroactive to January 1, 1998--the date of his retirement*. This retroactive payment covered the time period of January 1, 1998 to January 15, 1998, and was in the amount of $1,234.75. The Plan also arranged for regular processing of benefits to begin on February 15, with each check thereafter to be issued on the 15th of each month in the amount of $2,469.49. In a letter dated February 9, 1998, Mercer advised Mr. Shields that his checks would be paid accordingly. In total, only six monthly checks were issued to Mr. Shields prior to his death representing a total payment of $16,051.69 in benefits.[4]

---

[4] In the absence of the waiver, Mr. Shields would have received $2,271.93 per month during his life, and following his death, Plaintiff would have been entitled to receive $1,135.97 per month for the balance of her life. Therefore, in exchange for Mr. Shields's receiving an additional $197.56 per month, Plaintiff waived her right to receive $1,135.97 per month following his death.

Mr. Shields died on May 17, 1998. Following his death, Plaintiff sought surviving spouse benefits from the Plan. The Plan, however, denied the claim. Following this denial, Plaintiff's former attorney, Benjamin Hoffiz, sent correspondence to the Plan suggesting that Plaintiff's signature on the waiver form had been forged by Mr. Shields. Despite the serious nature of this accusation, Hoffiz submitted no evidence to support this assertion.[5] The Plan again reviewed the file and again denied Plaintiff's request for survivor benefits. The Plan's denial was based on what the Plan believed to be a validly signed election of benefits form and a properly signed and notarized QJSA waiver from the Plaintiff. Unable to convince the Plan that Mr. Shields committed forgery, Hoffiz filed a state lawsuit on behalf of Plaintiff. Plaintiff's case was removed to federal court because of the existence of a federal question under 29 U.S.C. § 1132, and jurisdiction was established pursuant to 28 U.S.C. § 1331.

After sitting as the trier of fact, the district court held that the Plan did not act arbitrarily or capriciously in rejecting Plaintiff's allegations that her signature on the QJSA waiver form had been forged. In so holding, the court issued detailed factual findings that reflect careful deliberation of the extensive evidence submitted during trial. It was the district court's conclusion that "the Plaintiff did not present any credible evidence to challenge the authenticity of the disputed

---

[5] The district court found "Hoffiz's testimony to be of little credible value because of the inconsistency in his testimony and his assertions without support about matters of significance to this controversy." In his letter to the Plan, Hoffiz had stated that "[i]t appears that her signature on her driver's license had been photocopied by Mr. Shields, who then traced it on a waiver form." Based on trial testimony, the district court found that "[a]t the time that Hoffiz sent his letter, he had not compared the signature on the waiver form with any other writing samples other than the Plaintiff's driver's license." The court continued, "[i]nterestingly, the license that Hoffiz claims to have inspected did not exist when the waiver was signed. Instead, an earlier license was in effect. Moreover, he had not spoken to [the notary public notarizing Plaintiff's signature] to investigate the matter further."

form." The court also rejected Plaintiff's legal challenges to the validity of the waiver form. Specifically, the court held that as a matter of law, "the waiver was not defective due to issues relating to the timeliness of its submission." Accordingly, the court found that Plaintiff had waived her right to receive any survivor benefits under the Plan.

## II.    STANDARD OF REVIEW

A challenge to an ERISA plan's denial of benefits is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If a plan grants such discretionary authority, the plan administrator's decision to deny benefits is reviewed under the deferential "arbitrary and capricious" standard of review. *See Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 555 (6th Cir. 1998) (*en banc*), *cert. denied,* 531 U.S. 814 (2000). A decision is not arbitrary or capricious if it "is rational in light of the plan's provisions." *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996) (quoting *Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991)). This standard "is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious." *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotation marks and citation omitted), *cert. denied,* 495 U.S. 905 (1990).

In the instant case, the district court found, and the parties agree, that the Plan confers discretion to the Employee Benefits Committee to determine benefits and interpret the Plan.[6] Thus, we review the Plan's decision to deny Plaintiff

---

[6] Section 9.3 of the Plan states "[t]he Committee shall administer the Plan and shall have complete control in the administration thereof. . . . The Committee shall have all powers which are reasonably necessary to carry out its responsibilities under the Plan including . . . the power to

benefits under the arbitrary and capricious standard. Of course, we review a district court's findings of fact following a bench trial for clear error, and its conclusions of law are reviewed *de novo*. *Davies v. Centennial Life Ins. Co.*, 128 F.3d 934, 938 (6th Cir.1997).

## III.    ANALYSIS

### A.    Factual Disputes

On appeal, Plaintiff continues to steadfastly deny ever signing the waiver form. However, she has not asked this court to review the district court's factual findings. Accordingly, because Plaintiff has not directly challenged the district court's factual conclusions, but rather has set forth the factual issues merely "to put the [legal] issues in context," all factual controversies are deemed abandoned on appeal and the district court's factual findings are hereby upheld. *See Bush v. Dictaphone Corp.*, 161 F.3d 363, 370 (6th Cir. 1999) (issues not pursued on appeal are waived).

### B.    Legal Issues

#### 1.    ERISA Analysis

We are primarily asked to decide two interrelated legal questions of first impression on appeal, namely whether: (1) the "applicable election period" within 29 U.S.C. § 1055 (c)(1)(A)(i) of ERISA ends with a plan participant's actual retirement date even when a plan is under no obligation to make benefit payments by the participant's date of retirement; and (2) the "annuity starting date," as that term is defined in 29 U.S.C. § 1055 (h)(2)(A)(i), is statutorily mandated to always be a plan participant's date of actual retirement. With

---

construe the Plan and to determine all questions that shall arise thereunder. . . ." The Plan also provides that "[e]xcept as otherwise provided herein, the decision of the Committee as to any dispute or question arising hereunder, including questions of construction, interpretation and administration shall be final and conclusive."

regard to the first question, we hold that when an ERISA-governed plan is not under an obligation to make benefit payments by a plan participant's actual retirement date, the applicable election period does not conclude with the participant's date of actual retirement. Accordingly, we find that under certain circumstances, a plan participant who retires early may waive QJSA benefits after his or her date of actual retirement. Regarding the second issue, we hold that the annuity starting date is not statutorily required to always be a plan participant's actual date of retirement. Thus, the annuity starting date is not the retroactive date of a voluntary and non-required benefit payment that reflects a participant's actual retirement date; rather, it is the date that a plan is under an obligation to begin making pension payments. Accordingly, under the facts of this case, the QJSA waiver complied with the timing provisions set forth in ERISA and therefore was enforceable as a matter of law.

The principal object of ERISA is "to protect plan participants and beneficiaries." *Boggs v. Boggs*, 520 U.S. 833, 845 (1997) (citation omitted). In 1984, Congress amended ERISA with the Retirement Equity Act (REA), 29 U.S.C. § 1052-56, "to ensure that individuals whose spouses die before their retirement would nevertheless receive the spouses' pension benefits." *Lefkowitz v. Arcadia Trading Co. Benefits Pension Plan*, 996 F.2d 600, 601 (2d Cir. 1993). The Supreme Court has noted that rights conferred by the REA were intended to "ensure a stream of income to surviving spouses." *Boggs*, 520 U.S. at 843.

As amended by the REA, ERISA provides that surviving-spouse benefits may be waived only if the participant obtains his or her spouse's written consent for such a waiver. 29 U.S.C. § 1055 (c)(2)(A). The timing provisions of ERISA provide that a plan participant "may elect at any time during the applicable election period to waive the qualified joint and survivor annuity form of benefit." *Id.* § 1055 (c)(1)(A)(i). The term "applicable election period" is defined to mean, in the case of an election to waive surviving-spouse benefits, "the 90-day period ending on the annuity starting date." *Id.*

§ 1055 (c)(7)(A). The term "annuity starting date" means "the first day of the first period for which an amount is payable as an annuity." *Id.* § 1055 (h)(2)(A)(i). Generally, "[a] sum of money is said to be payable when a person *is under an obligation to pay it.*" *Moyle v. Director, Office of Workers' Comp. Programs*, 147 F.3d 1116, 1122 (9th Cir. 1998) (quoting BLACK'S LAW DICTIONARY 1128 (6th ed.1990) (emphasis added), *cert. denied,* 526 U.S. 1064 (1999). Therefore, under a straightforward reading of ERISA's timing provisions, a participant and spouse may only waive the QJSA option during the 90-day period ending on the date that a plan is under an obligation to begin making pension payments. Attempting to implement these statutory requirements, the Plan provides that "an election not to take a qualified joint and survivor annuity must be delivered to the Committee during the period of 90 days before the date on which payment of the benefit commences." (Plan, § 6.2 (b)).

In the instant case, Mr. Shields retired early, effective January 1, 1998. Plaintiff insists that the "annuity starting date" was Mr. Shields's retirement date, i.e., January 1. From this premise, Plaintiff argues that the "applicable election period"--meaning the period during which a spousal waiver could be effectuated--was the 90-day period *ending* on January 1, 1998. The waiver signed by Plaintiff was dated January 21, 1998. Therefore, according to Plaintiff, the QJSA waiver form was dated and submitted approximately three weeks after the close of the election period. Thus, under Plaintiff's analysis "even if Plaintiff signed the waiver, it was defective as a matter of law because it was not signed during the applicable election period."

Although superficially persuasive, Plaintiff's analysis ignores the fact that as Mr. Shields was an early retiree, the Plan was under no obligation to begin making pension payments to him until his normal retirement date at the age of 65 (i.e., October 1, 2000), or, if before then, at the time Mr. Shields specified he wished to begin receiving pension benefits. In other words, the choice to begin receiving benefit payments belonged to Mr. Shields--not the Plan--and as such,

he could postpone his election of benefits until his normal retirement date.[7]  Therefore, contrary to Plaintiff's position, the fact that Mr. Shields retired on January 1, 1998, is not dispositive of this court's calculation of the "applicable election period" or the "annuity starting date."  As the district court explained, "ERISA does not require a retiree to elect a certain type of benefit on or about the annuity's [first possible] starting date.  Rather, in the judgment of the Court, [ERISA] *requires the retirement plan to allow the retiree to do so.*"  (Emphasis added).  Thus, we find that Mr. Shields was not required to submit the election of benefits form or the QJSA waiver form prior to his early retirement date because there was no obligation that the Plan make benefit payments by that date.  Also, we find that although Mr. Shields was free to elect an annuity starting date that corresponded to his retirement date, he was not mandated by ERISA to do so.  Therefore, the QJSA waiver form was not invalid merely because it arrived after Mr. Shields's early retirement date.

Furthermore, the fact that the Defendants "assumed" that January 1, 1998, was the annuity starting date or that Mercer calculated Mr. Shields's retirement benefit options with a January 1 annuity start date does not prove that Mr. Shields's annuity starting date was in fact January 1.[8]  When Mr. Shields requested to receive an explanation of benefits package, Mercer put together a chart setting forth the benefit payments that Mr. Shields and Plaintiff would receive every

---

[7] By deferring his payments until a later date, Mr. Shields would avoid a reduction in his monthly payments since an early retiree's benefits are typically reduced to adjust for the expectation that the retiree will collect payments for a longer period of time.  (Plan, § 4.2).

[8] Plaintiff cites trial testimony from Plan administrators who apparently conceded that the election of benefits and waiver forms were not submitted during the applicable election period.  On appeal, Defendants explain that these administrators were "momentarily bamboozled" into agreeing with a "bizarre" and "illogical" interpretation of ERISA and the Plan.  However, because the parties have asked us to resolve legal questions on appeal, any concessions or assumptions by the Defendants are of no consequence to our analysis.

month under each of the four benefit options.  Because Mr. Shields did not specify when he wished to begin receiving benefit payments, Mercer had to independently assume an annuity starting date.  Mercer's assumption that Mr. Shields's retirement date would also be his annuity starting date was a logical assumption.  However, Mercer's guess did not convert Mr. Shields's silence into the actual annuity starting date, nor did it set in stone the date that Mr. Shields's annuity payments had to begin.  The January 1 date was merely a marker that enabled Mercer to illustrate monetarily the different monthly payments available under the options.  As mentioned above, Mr. Shields was free to postpone his annuity starting date for almost three years after receiving the explanation of benefits package.  When Mr. Shields completed and returned the forms--all dated January 21, 1998--no date was designated as the date that he wished his benefits to commence.  Accordingly, as the district court correctly found, "[t]he only [specified] date [for benefits to begin] was an implicit one: 'as soon as possible.'"

When the Plan received Mr. Shields's completed forms, it had two options: (1) it could process Mr. Shields's forms and begin his payments as of February 1, 1998 (the Plan only pays in whole month cycles); or (2) it could retroactively pay Mr. Shields as of January 1, 1998.  Had the Plan chosen to begin issuing payments as of February 1, it would have been required to recalculate Mr. Shields's monthly benefits because Mercer's benefit illustration assumed a January 1 annuity start date.  Also, if the Plan decided to begin payments in February, not only would Mr. Shields lose his January payment, but his monthly payments would also have been slightly reduced due to an insurance peculiarity.  Instead of taking this approach-- and to Mr. Shields's advantage--the Plan paid Mr. Shields his benefits *retroactive to January 1* so that he would not forfeit his January payment and so he could receive payments at the higher rate that was illustrated on the schedule sent from Mercer.  The Plan has followed this practice in the case of other participants whose forms were received mid-month.

Given these circumstances, had the Plan commenced payments as of February 1--and not made a retroactive payment for January--as it was apparently entitled to do, Plaintiff would not have been able to challenge the timeliness of the election and waiver forms because on their face, the forms would have been signed, dated and submitted (i.e., on approximately January 21, 1998) during the 90-day period ending on the annuity starting date (i.e., February 1, 1998). Misinterpreting the meaning of the operative terms governing this analysis, the parties seem to agree that because the Plan made a retroactive payment of benefits, the "technical" *commencement of benefits date* was prior to the date that the forms were signed and submitted and hence a technical violation of ERISA and the Plan. However, for purposes of an ERISA analysis, the pertinent date is not the date that benefits *commenced*, but rather, the "annuity starting date" as that term is defined in the statute. Section § 1055 (h)(2)(A)(i) provides that the annuity starting date is the "first day of the first period for which an amount is payable as an annuity." Generally, "[a] sum of money is said to be payable when a person is under an obligation to pay it." *Moyle*, 147 F.3d at 1122. When the Plan received Mr. Shields's forms in mid-January, it was *not under an obligation* to commence benefit payments until February 1--the next available monthly payment cycle. The fact that the Plan made a voluntary and non-required retroactive benefit payment that reflects Mr. Shields's actual retirement date does not--contrary to the parties' apparent agreement--change the annuity starting date. Therefore, for purposes of ERISA, and under the facts of this case, the annuity starting date was February 1, 1998. Accordingly, the Plan's retroactive payment of January benefits--a payment it was not obligated to make--did not violate the timing provisions of ERISA.[9]

---

[9]Our analysis does not implicate the situation where a spouse signs a QJSA waiver form outside the applicable election period. By way of example, if a spouse signs a waiver form in June 2002, and the annuity starting date is in October 2002, then in this situation, the plain language of ERISA as well as the underlying policy of ERISA's timing provisions require such a waiver to be deemed invalid. In this hypothetical, the

### 2. The Plan's Timing Provisions

Under the terms of the Plan itself, the Defendants also did not technically violate the applicable benefits election timing provision. Section 6.2 of the Plan provides that "an election not to take a qualified joint and survivor annuity must be delivered to the Committee during the period of 90 days before the *date on which payment of the benefit commences*."[10] (Plan, § 6.2 (b)) (emphasis added). To commence is "[t]o initiate by performing the first act or step . . . [or] [t]o begin, institute or start." BLACK'S LAW DICTIONARY 268 (6th ed.1990). Read literally, the governing date for purposes of the commencement of benefit date is the "real time" date that the first payment was distributed, not the retroactive date that permitted the Plan to account for a prior pay period. As the district court observed, "[t]he fact that the Plan permitted the incorporation of additional monies into this [first] payment so as to assist the beneficiary in accounting for a prior pay period does not change the actual commencement date." Based on evidence presented to the district court, the date--in terms of "real time"--that the first benefit payment was made to Mr. Shields was some time between January 22 and February 9, 1998. As discussed above, ERISA required that Mr. Shields be given until at least February 1, 1998, to elect to waive the QJSA option. Thus, between the requirements of ERISA and the terms of the Plan, Mr. Shields had until at least February 1, and depending on when payments commenced, potentially February 9, 1998, to

---

spouse's waiver would have been attained approximately 120 days before the annuity starting date--well beyond ERISA's requirement that a spouse waive his or her survivor benefits during the 90-day period ending on the annuity starting date.

[10]The language of the timing provisions relevant to the waiver of QJSA benefits is slightly different under the terms of the Plan than under the statutory provisions of ERISA. The Plan imprecisely speaks of a benefit "commencement date" as opposed to an "annuity starting date." Although encompassing slightly different meanings, for purposes of this analysis, the Plan's terms are not inconsistent with requirements of ERISA, and therefore are enforceable.

make his benefit election and QJSA waiver. The district court found that the commencement of benefits date was some time between January 22 and February 9, 1998. Regardless of the precise benefit commencement date, the election and waiver forms dated January 21, 1998, were in fact delivered "during the period of 90 days before the date on which payment of the benefit commences." (Plan, § 6.2 (b)). Therefore, contrary to the Plaintiff's arguments, the Plan's retroactive payment of benefits did not violate the timing provisions of the Plan.[11]

## C. Whether the Defendants Acted Arbitrarily or Capriciously

The Defendants did not act arbitrarily or capriciously by accepting Mr. Shields's benefit election forms, including the QJSA waiver, as timely. As already discussed, Mr. Shields

------

[11]This interpretation also gives meaning to the rest of § 6.2 (b), which provides that "[a]ny election made under this Section may be revoked in writing during the specified election period . . . ." If we accept Plaintiff's argument that the applicable election period ended on January 1, 1998, then Mr. Shields and Plaintiff would have been denied their revocation right under the Plan. That is, Mr. Shields and Plaintiff obviously would be unable to revoke their designation by January 1, when they submitted their forms on approximately January 21. Under our analysis, Mr. Shields and Plaintiff would have until at least February 1, 1998, and potentially February 9, 1998, to revoke their January 21 election and waiver.

Also, by interpreting "commencement" to mean the real time date that the first payment was distributed we also give proper meaning to § 6.2 (c) of the Plan, which provides that "the Committee shall furnish to the Participant, within a reasonable time no less than 30 days and no more than 90 days before the date as of which the first annuity payment is to commence . . . a written explanation of [benefits] . . . ." The Plan sent Mr. Shields and Plaintiff a written explanation of benefits package on December 9, 1997. If the benefit commencement date was some time between January 22 and February 9, then the December 9 package would have been delivered within the time period allowed by the Plan. However, under the Plaintiff's interpretation, if January 1 was the benefit commencement date, then the Plan would not be in compliance with § 6.2 (c) even though Mr. Shields and Plaintiff had in terms of "real time" at least 43 days to consider their options.

retired from QSP effective January 1, 1998, at the age of 62. As an early retiree, he was not required to start receiving benefits until his normal retirement date of October 1, 2000. When he returned his completed forms dated January 21, 1998, he did not designate a date on which he wished his benefits to commence. The Defendants' conclusion that he wanted his benefits to begin "as soon as possible" was not arbitrary or capricious.

Also, when Mr. Shields did not specify the date that he wanted his benefits to commence, the Plan could have either begun pension payments as of February 1, 1998, or retroactively paid him as of January 1, 1998. The latter option would avoid the difficulty of having to recalculate the monthly benefits and would also prevent Mr. Shields from losing his January payment. The district court found that the Plan followed the latter option in the case of other participants whose forms were received mid-month. Given the facts of this case, there is nothing arbitrary or capricious in the Defendants' decision to make a voluntary retroactive payment to the advantage of Mr. Shields, a payment that did not affect the "annuity starting date" as defined by ERISA or the "benefit commencement date" as set forth in the Plan.

Our conclusion finds support in a recent decision from the Northern District of Ohio, the only federal case we have been able to locate that addresses a similar situation as the case at hand. In *Weirauch v. Sprint Retirement Pension Plan*, 182 F. Supp. 2d 638 (N.D. Ohio 2002), a spouse argued that her waiver of survivor benefits should not be enforced because the waiver was untimely. Specifically, she argued that under the terms of her deceased husband's plan, her waiver should have been made during the 90-day period before her husband's annuity starting date.[12] *Id.* at 642. Because the annuity starting date was retroactively determined to be

------

[12]The plan specifically provided that "[t]he waiver must be executed and consented to by the Member's spouse . . . during the 90-day period ending on the Member's Annuity Starting Date. . . ." 182 F. Supp. 2d at 643 (emphasis removed).

January 1, 1994, and the plaintiff signed her waiver on February 11, 1994, the plaintiff contended that the waiver was untimely and thus invalid under the plan.[13] *Id.* at 642. The defendant argued that the annuity starting date was made retroactive for the benefit of the plaintiff and her husband, and that if the plan had refused the husband's request to grant his retirement application retroactive to January 1, his annuity starting date would have been after February 11, 1994, the date of the waiver. *Id.*

Reviewing the plan's decision to deny benefits under the arbitrary and capricious standard, the court found that the plain language of the applicable plan section did "not invalidate waivers that are executed after the annuity starting date." *Id.* Also, because no plan term squarely addressed the issue of waiver untimeliness due to a retroactive benefit payment, the court deferred to the plan's reliance on Revenue Procedure 2002-47, 2002-29 I.R.B. 133, 2002 WL 1378623, to interpret the plan and determine the plaintiff's claim.[14] *Id.*

---

[13]In *Weirauch*, the district court was not asked to decide the annuity starting date; instead, the court accepted at face value the plan's determination that the retroactive date of an annuity payment was the annuity starting date. *See* 182 F. Supp. 2d at 642 ("*Because the starting date was determined retroactively to be January 1, 1994,* and plaintiff signed her waiver on February 11, 1994, plaintiff contends the waiver was not timely and thus under the Plan is invalid.") (emphasis added). In the instant case, we have been asked to determine whether, as a matter of law, the annuity starting date is the date of a non-required retroactive payment that coincides with the actual retirement date. It is not. Instead, it is the date that a plan is under an obligation to begin making pension payments. Therefore, although the district court's analysis in *Weirauch* was premised on an assumption we reject here, that assumption was not in dispute nor was it the product of legal analysis. Accordingly, we take no issue with the district court's analysis on the issues before it, namely, whether a QJSA waiver signed after the annuity starting date--as that date was determined by the plan--was invalid and whether the plan's corrective approach was arbitrary and capricious.

[14]The pertinent provision of the Revenue Procedure provides that in certain situations, "[t]he permitted correction method [for untimely or missing consents] is to give each affected participant a choice between

---

at 643. Finding that the plan complied with the provision of the Revenue Procedure, the court held that the "use and interpretation of the ERISA provision was reasonable because the Plan did not address squarely the circumstances of plaintiff's claim." *Id.* at 643-44. In the case at bar, because the benefit election and waiver forms were not untimely, the Defendants did not act in an arbitrary or capricious manner in accepting and processing the benefit election and QJSA waiver forms.

**AFFIRMED.**

---

providing informed consent for the distribution actually made or receiving a qualified joint and survivor annuity." Rev. Proc. 2002-47, 2002-29 I.R.B. App. A. at. 07.