NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0184n.06
No. 19-3365

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

TERESA OUTWARD,                                      )
     Plaintiff-Appellant,                       )
                                  )
v.                                                   )
                                    )
EATON CORPORATION DISABILITY                         )
PLAN FOR U.S. EMPLOYEES and                          )
EATON CORPORATION HEALTH AND                         )
WELFARE ADMINISTRATIVE                               )
COMMITTEE,                                           )
     Defendants-Appellees.                      )

**FILED**
Mar 30, 2020
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OHIO

BEFORE:     DAUGHTREY, CLAY, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Plaintiff Teresa Outward originally brought this case in federal district court to challenge the denial by the Eaton Corporation Health and Welfare Administrative Committee of continued long-term disability benefits under the Eaton Corporation Disability Plan for U.S. Employees. Pursuant to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461, she now challenges a number of rulings by the district court upholding that denial. First, she contends that the district court improperly ratified what she considers to be a change in the Plan's definition of "disability" that has allowed denial of benefits to claimants able to perform even part-time work in any job in the economy. Second, Outward argues that the district court erred in denying her the opportunity to engage in additional discovery aimed at uncovering the reasons for that alleged change in the Plan's interpretation. She also alleges that the district court should have concluded that the Plan's

administrator breached a fiduciary duty to her, that the denial decision was unconscionable, and that it was arbitrary and capricious in light of the evidence in the administrative record.

Although we find no merit to Outward's claims regarding changes in the Plan's definition of "disability," the denial of the motion for further discovery, the alleged breach of fiduciary duty, or the claim of unconscionability, we conclude that the district court erred in upholding the determination that Outward was not entitled to long-term disability benefits based on the record before the Plan Administrator. Because the administrative decision-maker failed to consider certain objective findings regarding Outward's debilitating conditions, the denial of benefits must be considered arbitrary and capricious. We thus reverse the decision of the district court and remand this matter with instructions to return the case to the Plan Administrator for a full and fair review of all relevant evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

Teresa Outward, the holder of a Bachelor of Science degree in electrical engineering, began working for the Eaton Corporation in 2001 as a medium voltage switch program manager. By the end of 2011, she also had worked for Eaton as a strategic pricing manager, a sales and marketing training manager, and a corporate marketing manager. After suffering a miscarriage in August 2011, however, her physical condition began to deteriorate rapidly such that she was unable to work after early December 2011. By May 2012, Outward's "energy level continued to diminish over time," and she was diagnosed at various times with sinusitis, pneumonia, pleuritis of the chest wall, Epstein-Barr virus,[1] immunodeficiency, pernicious anemia, dysautonomia,[2] and three

---

[1] Epstein-Barr virus, or EBV, "is a member of the herpes virus family" and "can cause infectious mononucleosis." EBV's symptoms include fever and fatigue that can last from two weeks to several months. Centers for Disease Control and Prevention, https://www.cdc.gov/epstein-barr/about-ebv html (last visited Mar. 26, 2020).

[2] Dysautonomia causes malfunctions in the autonomic nervous system, which "controls the 'automatic' functions of the body that we do not consciously think about, such as heart rate, blood pressure, digestion, dilation and constriction of the pupils of the eye, kidney function, and temperature control." As a result, individuals suffering

bulging discs.  Consequently, she applied for benefits under Eaton's Long-Term Disability Plan for U.S. Employees, a self-insured plan administered by the Eaton Corporation Health and Welfare Administrative Committee.

As the Plan Administrator, the Committee is vested with broad discretion in implementing the Plan, as explained in the following section of the Summary Plan Description:

> Benefits under the Eaton Long Term Disability Plan will be paid only if the Plan Administrator and/or Claims Administrator decides that the applicant is entitled to them under the terms of the Plan.  The Plan Administrator and/or Claims Administrator has discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including but not limited to, any disputed or doubtful terms.  The Plan Administrator and/or Claims Administrator also has the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan.  Any and all determinations by the Plan Administrator and/or Claims Administrator will be conclusive and binding on all persons, except to the extent reviewable by a court with jurisdiction . . . .

> A beneficiary under the Plan is considered to have a covered disability if:

> - During the first 24 months, including any period of short term disability, you are totally and continuously unable to perform the essential duties *of your regular position* with the Company, or the duties of any suitable alternative position with the Company; and

> - Following the first 24 months, you are totally and continuously unable to engage *in any occupation or perform any work for compensation or profit* for which you are, or may become, reasonably well fit by reason of education, training or experience—at Eaton or elsewhere.

(Emphases added.)  Additionally, the Plan provides:

> Objective findings of a disability are necessary to substantiate the period of time your health care practitioner indicates you are disabled.  Objective findings are those that can be observed by your health care practitioner through objective means, not from your description of the symptoms.  Objective findings include:

---

from dysautonomia may experience "lightheadedness, fainting, unstable blood pressure, abnormal heart rates, malnutrition, and in severe cases, death."  One form of dysautonomia is Postural Orthostatic Tachycardia Syndrome, or POTS, which causes disabilities that have been compared by researchers "to the disability seen in conditions like COPD and congestive heart failure."  Dysautonomia International, Inc., http://www.dysautonomiainternational.org/page.php?ID=34 (last visited Mar. 26, 2020).

- Physical examination findings (functional impairments/ capacity);
- Diagnostic test results/imaging studies;
- Diagnoses;
- X-ray results;
- Observation of anatomical, physiological or psychological abnormalities; and
- Medications and/or treatment plan.

Because of the diagnoses indicated by Outward's treating physician, Dr. Doris Corey, then affiliated with the Cleveland Clinic, the Committee approved disability payments to Outward for the 24-month period ending on December 5, 2013. Six months prior to the expiration of those benefits, an Eaton representative informed Outward that, in accordance with the terms of the Plan, the claimant now was responsible for providing objective medical documentation indicating that she was "unable to engage in any occupation" in order to receive continued disability payments.

In response, Outward produced records from her visits to various medical specialists, as well as reports from doctors who simply reviewed Outward's medical records. Those records and reports included the following information from these practitioners:

**<u>Dr. Doris Corey (Outward's treating physician)</u>:** Corey examined Outward approximately every three weeks during the relevant time span. Throughout that period, Corey consistently noted that Outward suffered from malaise and fatigue, tingling and numbness in her extremities, difficulty focusing, and postural orthostatic tachycardia syndrome (POTS). Initially, Corey believed that Outward's prognosis for returning to work was "[e]xcellent," although she would have to begin working only part-time and with certain restrictions, such as changing positions frequently and abstaining from traveling and from giving oral presentations. Over the course of later follow-up visits, however, Corey's assessment of Outward's prognosis began to change. On October 6, 2012, Corey

noted that Outward had suffered setbacks in her recovery and now required more sedentary positions and bedrest. Moreover, those restrictions now could be considered permanent, extending any timeframe for recovery to an additional one-to-two years. By November 27, 2012, Outward's condition had deteriorated even more, to the point that Corey "advised her not to return to work."

On June 10, 2013, Corey reiterated her diagnosis of Outward's POTS and dysautonomia based upon "[p]hysical findings on exam," "diagnostic testing (QSART findings); EPS test," "response to medication," "[b]lood [p]ressures," and "office notes from ophthalmology."[3] She further reported that Outward's symptoms would be a constant interference with the claimant's "attention and concentration needed to perform even simple work tasks during a typical work day," and that she likely would be absent from work five days a week due to her need for frequent "down time."

By March 6, 2014, Corey had seen Outward on numerous additional occasions and had concluded that Outward's POTS and joint hypermobility syndrome would restrict her activities for the remainder of her life. Corey noted that Outward is forced to rest for days at a time, that the patient's extreme fatigue always interferes with her ability to function, that she is unable to sustain even sedentary work, that she has short-term memory loss and impaired word-finding, and that she is slow processing new information. Corey also explained that after Outward submitted to an ordered functional capacity exam, "she could not sleep due to pain from the day[']s[ ] activities: and spent the next 2 days "[c]rawling"

---

[3] QSART, or quantitative sudomotor axon reflex test, "is a test that measures the autonomic nerves that control sweating. The test is useful in assessing autonomic nervous system disorders, peripheral neuropathies, and some types of pain disorders." https://my.clevelandclinic.org/health/diagnostics/16398-quantitative-sudomotor-axon-reflex-test-qsart (last visited Mar. 26, 2020).

EPS, or electrophysiology study, "is a test that records the electrical pathways of your heart." https://www.webmd.com/heart-disease/electrophysiology-test (last visited Mar. 26, 2020).

around and was in bed due to pain and fatigue due to the exertion of the [exam]." Thus, Corey did not anticipate Outward's return to employment.

**Timothy Shanor (board-certified orthopedic specialist):** Shanor examined Outward on September 18, 2013, and noted that her impairments included "global muscle weakness, severe fatigability, vestibular dysfunction and significant pain and muscle spasms in lumbar and cervical spine. In addition she has nerve abnormality which includes symptoms of global numbness." According to Shanor, Outward's limitations are permanent, meaning that "her prognosis for return to meaningful work is poor at this time." Nevertheless, although Shanor concluded that the various limitations affected Outward's "ability to perform many tasks including full time work," "[s]he has the abilities to work at a sedentary or light level" for no more than four hours a day, but "[t]he nature of dysautonomia . . . would require many absent days"—two days per week on average.

**Stanley Barylski (physical therapist):** Barylski oversaw Outward's October 2013 functional capacity examination (FCE) that lasted for more than four hours. Even though Outward exhibited a "progressive decline in her functional tolerance" during the examination—such that she had to increase her rest times between tests and "twice requested to lay down for 2-3 min[utes]—Barylski still concluded that she could function in the "light Physical Demand Category" and could work for eight hours a day.

**Dr. Robert Hostoffer, D.O.:** Hostoffer also examined Outward in October 2013 and concurred in Corey's assessment that Outward's limitations precluded her from any employment. He noted that "she has limited concentration and focus," that she "needs frequent change in position every 20 min[utes] for [and] due to lack of stamina," and that she "needs freq[uent] ability to rest thru the day."

**Dr. Fredric Glass (board-certified in occupational medicine):**  After Outward completed her functional capacity examination with Barylski, Glass was asked to review the results of that session, as well as Outward's other medical records, and offer an opinion as to her ability to return to work.  Doing so, he stated that Outward's "signs of impairment are not objective but related to subjective symptoms of fatigue and malaise and to decrease[d] tolerance for activities.  Physical objective findings of impairment are not present."  He concluded that Outward could sit for eight hours a day in 45-minute increments, could stand for up to eight hours in five-minute increments, and could walk for 10-12 minutes at a time for eight hours a day.  He thus claimed that Outward "has capacity to work an eight[-]hour day, five days a week."

The Plan Administrator then referred Outward to three independent examiners who offered the following findings:

**Dr. Donald Mann (neurologist):**  Mann focused his examination of Outward on her complaints of tingling, weakness, and numbness in her extremities in order to determine whether the prior diagnosis of dysautonomia could be supported.  After reviewing prior records and conducting his own neurological exam, Mann concluded that "[n]o specific neurologic diagnosis is detectable that would explain a lack of capacity to work."  The record review and testing "f[e]ll short of confirming  the diagnosis of 'ocular migraine' headache, POTS and dysautonomia as tilt table testing was normal, autonomic symptoms are limited and explicable possibly on other basis."  As Mann explained, "The absence of bladder/bowel symptoms as well as other autonomic symptoms such as dryness diminishes the diagnosis of dysautonomia."  He did admit, however, that Outward's sensory complaints "may have some validity in connection to the other alleged portions in the

claim, namely EBV infection, anemia, and immunodeficiency (disorder), not addressed in the neurologic examination performed." Nevertheless, Mann concluded that Outward had no limitations that would preclude her working eight hours a day, five days a week.

**Dr. Ilhan Haque (board-certified in cardiology):** In his examination of Outward, Haque identified no objective data supporting the diagnoses of POTS and dysautonomia and found nothing to explain Outward's inability to work. Even so, he concluded that Outward was not able to work an eight-hour day. Even if she performed only sedentary work, he suggested that Outward "start with a 4 hour a day workday (work 3 hours and rest) with breaks in between and work up to six hours a day over time." The transition from a four-hour to a six-hour workday, however, "may take 4-6 weeks to develop." Furthermore, any "transition from six to eight hour a day work week may take another six months or may not occur at all."

**Dr. Elizabeth Mease (internal, preventive, and environmental medicine):** In January 2014, Mease performed the final of the three independent medical examinations ordered by the Eaton Plan Administrator. She noted Outward's overwhelming fatigue but found "insufficient objective medical information to support the employee's complete inability to work." Because Mease found no "evidence of significant neuro-cognitive impairment that would preclude the ability to work," she offered her opinion that Outward could perform the light physical demand activities of her previous job, could sit "for over 6 ½ hours in an 8 hour shift," "stand up to 40 minutes in an 8 hour shift," and "walk up to 40 minutes in an 8 hour shift."

In the midst of Outward's examinations by the independent medical examiners selected by the Plan Administrator, she kept a December 17, 2013, appointment with Dr. Blair Grubb, a

professor of medicine and pediatrics at the University of Toledo Medical Center and the director of the Medical Center's clinical cardiac electrophysiology program. After examining Outward and reviewing her medical history, Grubb stated in a letter to Dr. Corey:

> I concur with her diagnosis of postural tachycardia syndrome, but feel it is occurring due to an underlying condition referred to [as] joint hypermobility syndrome. This condition affects 1 out of every 5000 individuals and is characterized by having more elastic kind of collagen than normal in skin ligaments in the venous vasculature. During periods of orthostatic stress, these individuals pool greater than normal degree of blood in the dependent areas of the body which then result[s] in a compensatory increase in heart rate and myocardial contractility. However, this is really fully compensatory leading the patient [to experience] extreme fatigue, exercise intolerance and orthostatic intolerance.

On January 24, 2014, Corey saw Outward for a "recheck on her consultation" with Grubb. At that time, Corey noted that she concurred in Grubb's diagnosis of POTS, brought on by joint hypermobility syndrome.[4] Corey then explained in an update to the Plan Administrator that Outward's conditions were permanent and incurable, that those physical conditions "make[ ] it so Teresa is unable to sustain even sedentary work," that Outward is so debilitated that she "is unable to shower and prepare and feed herself 3 meals for 3 days in a row, and that she "has the equivalent life-style of someone that has C.O.P.D. and congestive heart failure."[5]

In March 2014, Corey filled out additional forms requested by the Plan Administrator. In those forms, she reiterated that Outward's severe fatigue rendered the claimant unable to sustain even sedentary work, that the "patient requires complete freedom to rest frequently without restriction," and that she "must manage the symptoms by laying down for minutes, hours or days."

---

[4] Hypermobility of joints also can fall under the diagnosis of Ehlers-Danlos Syndrome-type III, or EDS-type III.

[5] COPD, or chronic obstructive pulmonary disease, "is a chronic inflammatory lung disease that causes obstructed flow from the lungs." https://www.mayoclinic.org/diseases-conditions/copd/symptoms-causes/syc-20353679 (last visited Mar. 26, 2020). Congestive heart failure "occurs when your heart muscle doesn't pump blood as well as it should." https://www.mayoclinic.org/diseases-conditions/heart-failure/symptoms-causes/syc-20373142 (last visited Mar. 26, 2020).

Corey further reported that Outward "has constant muscle pain, joint pain, bone pain, vision problems and headaches due to the [joint hypermobility syndrome]. The patient's heart rate, blood pressure, digestion and other autonomic functions of the body are [compromised] due to the Dysautonomia P.O.T.S." She noted that Outward also suffered from short-term memory loss, shortness of breath, "impaired word-finding," problems with depth perception and hand-eye coordination, light sensitivity, and sporadic fainting and vomiting.

Many of the symptoms of which Outward complained—fatigue, pain, numbness, instability, cognitive problems, and exercise intolerance—although typical of and consistent with diagnoses of POTS and joint hypermobility syndrome, were not demonstrable through medical testing. In her report, however, Corey did list a number of verifiable medical findings supporting those major diagnoses. Specifically, when discussing Outward's diagnoses for dysautonomia and POTS, Corey mentioned Outward's blood pressure readings, "QSART findings confirming small fiber neuropathy and failure of sweat test," a "[h]emodynamic test show[ing] problems with standing and sitting towards fainting and showed anemia," and responses to medication. Similarly, Grubb's diagnosis of joint hypermobility syndrome was supported by Outward's responses to physical therapy exercises and massages, by "[o]bservation, documentation, and trending of muscle tightness," and by a Beighton score of 6/9.[6]

---

[6] "The Beighton score is a popular screening techniques for hypermobility. This is a nine-point scale and requires the performance of 5 maneuvers, four passive bilateral and one active unilateral performance." https://www.physio-pedia.com/Beighton_score (last visited Mar. 26, 2020). The following elements of the test are given a maximum score of 2 points each, because they are performed bilaterally: "[p]assive dorsiflexion and hyperextension of the fifth [metacarpal] joint beyond 90°; [p]assive apposition of the thumb to the flexor aspect of the forearm; [p]assive hyperextension of the elbow beyond 10°; [p]assive hyperextension of the knee beyond 10°." Id. The final element—"[a]ctive forward flexion of the trunk with the knees fully extended so that the palms of the hands rest flat on the floor"—receives a score of either 0 or 1. Id. "The maximum score for ligament laxity is 9. A score of 9 means hyperlax. A score of zero is tight. Several researchers appoint a score of 0-3 as normal and a score of 4-9 as representing ligamentous laxity." Id.

The Plan Administrator then requested a transferable skills analysis from Genex Services, Inc., a company whose website touts its ability to reduce workers' compensation reserves for businesses, contain costs, improve return-to-work outcomes, and reduce the costs of medical care on lost-time cases. *See* https://www.genexservices.com/. In providing that analysis, Genex did not consider the January and March reports from Dr. Corey. Instead, relying solely on the opinions of Dr. Glass, Stanley Barylski, Dr. Mann, Dr. Haque, and Dr. Mease—all of whom believed that Outward could perform light physical jobs for at least four hours a day and as long as eight hours a day—Genex identified three jobs in relative proximity to Outward's home that would allow her to work four days per week and earn between $9.00 per hour and $11.00 per hour. All three of those jobs, however, either required or preferred that the person to be hired have sales, call center, or customer service experience—experience that Outward did not possess.

After reviewing the Genex report, the Plan Administrator sent a letter to Outward informing her that her long-term disability benefits would not continue past March 31, 2014. To support that determination, the Plan Administrator noted that the Plan defined long-term disability as the inability to perform *any* work for compensation or profit at Eaton or elsewhere. Because Barylski, Mann, Haque, and Mease all concluded that Outward could perform at least part-time work, and because Genex identified three such jobs near Outward's home, the Plan Administrator too determined that Outward was "capable of working at a light/medium physical demand level of exertion 4 hours per day with a 15 minute break every hour."

Outward exercised her rights under the Plan and appealed that determination, contending that the decision was not supported by substantial evidence, was arbitrary and capricious, did not consider the entire record, and improperly interpreted the Plan's "any occupation or perform any work" language to permit cessation of benefits if the employee could perform even part-time work.

In support of that appeal, Outward submitted additional documents, one of which was a 14-page letter from Dr. Corey disagreeing with the denial of future long-term disability benefits to Outward. In that letter, Corey stated pointedly:

> Mrs. Outward's diagnoses of Ehlers-Danlos Syndrome (EDS) and Postural Orthostatic Tachycardia Syndrome (POTS) is complicated, as it is a process of elimination. Mrs. Outward was born with Ehlers-Danlos syndrome (EDS), which is a collagen DNA defect that affects every system and organ in her body. POTS has developed as a result of the EDS, as her muscles and veins became too weak to properly support her vascular system. The EDS was not diagnosed until December 17, 2013. Both EDS and POTS are chronic, progressive, and incurable. *There is not a MRI, CT scan, X-ray, blood test, or DNA test that objectively proves the diagnoses.* It is not uncommon to take years to tease apart the diagnoses.
>
> *An individual doctor not familiar with EDS and not familiar with this lady is unable to make an easy, proper judgement of this complicated case resulting in her less-than-sedentary lifestyle. The entire picture must be reviewed, not a single test or a single doctor visit.* Mrs. Outward is a conscientious, intelligent woman who answered the [independent medical examiners'] questions. She was unable to drive herself to the appointments, eat, shower the day of the appointments, and required bed rest the day before and after the appointments. Mrs. Outward's positive personality, humility, embarrassment over her condition, professional demeanor, extreme intelligence, lack of complaining, tolerance of pain, rare diagnosis, optimism, and will to live adds to the difficulty of a doctor meeting her for the first time and spending only an hour with her to make a proper determination. Mrs. Outward did not choose to be in her current medical situation and is using her skills to make the best of it. *The short snippet of time spent by [the independent medical examiners] in no way can ever capture the reality of Mrs. Outward's disease process.*

(Emphases and alterations added.)

Corey explained why the reports and functional capacity exams upon which the Plan Administrator relied in denying benefits to Outward were both incomplete and incorrect. She then concluded her letter by explaining in everyday, non-medical language:

> Mrs. Outward wakes up in the morning and feels "bad" every single day of the year. She is not able to make plans, as she does not know if she will even be able to get out of bed. A good day for her, is that she can shower. A wonderful day, is that she can shower, feed herself, and read to her son. Even on the good and wonderful days, she requires time spent in the horizontal position, takes frequent rests, and takes a nap. On bad days, she doesn't shower, is not able to feed herself and has to crawl to the bathroom. Dr. Hostoffer explained that because every system is

affected, she is not able to recover. In addition, she has no energy reserve and is not able to build one. So when she gets a little energy after days of rest, she has to decide what to do with it. Does she shower or skip it so she can speak with her Mother on a telephone call? Does she feed herself or feed her child? These are the types of decisions that Mrs. Outward makes on a daily basis.

Mrs. Outward is completely disabled as described in this document, with objective evidence to support the diagnoses of EDS and POTS. To help you further understand, even though Mrs. Outward is 43 she has the lifestyle of someone that has COPD and congestive heart failure. Another analogy regarding her symptoms, is that she faces similar obstacles of someone that has MS and a heart condition. Mrs. Outward says, "She is 43 on the outside and 83 on the inside." I think that sums it up perfectly. I do not anticipate her return to work.

Corey also submitted answers to a provided questionnaire and stated that Outward would need to take an unscheduled break every five to ten minutes during an eight-hour work day. Moreover, she would need to rest for 30-60 minutes before returning to work. Corey concluded her assessment by explaining that Outward "has 'bad days' & 'worse days.'"

As part of her appeal, Outward also offered a 2014 report prepared by Kathleen Reis, a vocational rehabilitation counselor, who was asked to assess whether Outward's "residual vocational profile would allow her to perform any jobs." Before preparing her report, Reis examined Corey's records, the analyses of independent medical examiners, Grubb's residual-functional-capacity opinion, and Genex's transferable skills analysis. In addition, she met personally with Outward for approximately 90 minutes. After examining the information collected, Reis disagreed with the Genex assertion of Outward's transferable skills and explained, "Although [Outward's] engineering duties were connected with sales functions, she did not sell products, but rather guided a process, which if implemented, would result in higher sales. Her role was as an engineer-educator not sales person." Furthermore, Reis explained that the reports from Mann, Haque, and Mease were not useful in determining what work Outward could do due to incorrect assumptions, non-pertinent analyses, and faulty characterizations of Outward's limitations. She also considered Genex's vocational assessment "flawed to the point of being

**unusable as a reliable source of analysis of the data**," because Genex used incorrect job titles for Outward's work history, relied on incorrect medical diagnoses, and "did not identify jobs and employers who would accommodate restrictions." (Emphasis in original.) Reis thus concluded:

> As this case stands, the only **vocational conclusion that can be reached is that there are no jobs this individual could sustain**. It would be impossible for an employer to configure a set of work accommodations around the permanent restrictions to functional ability and get the minimum level of production needed to cover the cost of employing the restricted individual. In other words, any employer employing Ms. Outward would lose money by doing so.
>
> Teresa Outward has lost the capacity to perform competitive work on a sustained basis. Even with treatment and management of the underlying causative conditions, the inability to adhere to a work schedule and meet deadlines would still pose an insurmountable barrier to employment. In her current condition, Ms. Outward is clearly [ ] incapable of competitive employment.

(Emphasis in original.)

Also included in the information on appeal was a 2014 decision from the Social Security Administration that resolved Outward's claim for disability benefits under the provisions of the Social Security Act. In that ruling, an administrative law judge found that Outward, since December 2, 2011, had been disabled under the Act because she cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months."

Upon receipt of the information compiled for the first-level appeal, the Plan Administrator provided those records for review to three physicians who had, until that point, no connection with the claim. Given the almost identically worded synopses of Outward's medical history in the reports of Drs. Michelle Park, Robert Bryg, and David Brenner, however, it is clear that another party identified and highlighted the records upon which the physicians were to base their opinions regarding the extent of Outward's disabilities.

With the provided information, Park, who was board-certified in internal medicine, unbelievably concluded that Outward "does not have any condition which requires restrictions or limitations as of 04/01/14." Furthermore, Park took issue with any test results supporting Outward's diagnoses and stated that she was "unable to find any clinical evidence to support the necessity for restrictions or limitations."

Bryg, who was board-certified in cardiovascular disease, did conclude, however, that Outward suffers from EDS and POTS, has profound fatigue as a result, and is unlikely to return to full-time work. After evaluating Outward from a cardiovascular perspective only, he stated:

> The claimant cannot work more than 4 hours per day. She is unable to walk for more than 15 minutes at a time. She cannot lift/push/pull/carry more than 10 pounds frequently and 20 pounds occasionally. She can finger without restriction. She can sit for up to 4 hours per day with periods of rest every hour if she becomes fatigued.

Brenner, board-certified in neurology, offered no opinion on whether Outward's POTS or EDS would affect the claimant's ability to return to full-time employment. He did, however, discount Corey's findings of restrictions and limitations simply because, on three office visits in April and June 2014, Outward was "awake, alert, [and] oriented," and twice had what was considered a normal gait. Brenner thus concluded that "[t]he claimant can return to work without restrictions/limitations *from a neurology perspective*." (Emphasis added.)

Because Bryg concluded that Outward could not work *more than* four hours per day and could sit for *up to* four hours a day with periods of rest every hour, the Plan Administrator asked Genex to perform another transferable skills analysis and labor market survey that would take those restrictions into account. Doing so, Genex concluded that there were two jobs in the vicinity of Outward's residence that she could perform—a part-time platelet tele-recruiter for the American Red Cross (paying $11.00/hour) and a part-time appointment setter for LeafFilter Gutter Protection (paying $9.00/hour). Although the Red Cross does hire for the listed part-time position, Genex

conceded that there were no such openings at that time. Likewise, LeafFilter Gutter Protection was not hiring at that time for its part-time positions—positions that are staffed during the evening shifts only, from 5:00 or 5:30-9:00 p.m. Mondays through Thursdays.

When reviewing the evidence on appeal, the appeal specialist from the Eaton Disability Management Center made special mention of Bryg's opinion that, "[f]rom a Cardio-Vascular perspective[,] Ms. Outwards [sic] has permanent restrictions of no work more than four (4) hours per day." Apparently construing that outer limit of employability to mean that Outward could work for four days per day on a regular basis, the appeal specialist concluded that "medical documentation does not document a severity of Ms. Outward's condition(s) that supports her complete inability to perform any job as of April 1, 2014." Because Outward thus "did not meet the Plan's definition of disability," her "claim for benefits remains denied."

Pursuant to the provisions of the Plan, Outward filed a final appeal of the disability determination. That appeal, and indeed any final appeal under the Plan, includes a review of all information related to the claim for benefits, including information not previously available to any decision-maker. Moreover, the Plan mandates that the review "be a 'fresh' look at the Claim without deference to the denial decision. The review on appeal will be conducted by a person or committee not involved in the previous denial decision."

On September 29, 2015, the Eaton Corporation Health and Welfare Administrative Committee upheld the denial of long-term disability benefits. In large part, the "fresh" look at the evidence relied upon the same functional-capacity examinations and independent medical examinations that suggested that Outward was capable of performing physical light duty work on a part-time basis. Also, as in the earlier denials of benefits, the Committee disregarded the opinion

of Dr. Corey, Outward's treating physician, because it "found issues with the lack of objective clinical data in support of the medical conditions allegedly impacting" the claimant.

Having received a final decision pursuant to Eaton's internal review, Outward filed a complaint and an amended complaint in federal district court against the Plan and the Committee and alleged violations of the provisions of sections of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001–1461. Specifically, she claimed that the defendants arbitrarily and capriciously denied her request for long-term disability benefits, that the defendants had an inherent conflict of interest, and that the defendants intentionally hired biased medical reviewers to consider her claim.

Prior to the filing of any dispositive motions, however, the defendants moved to remand the matter to the Plan Administrator after discovering "that certain documents submitted by Plaintiff during the administrative processing of her claim were not transmitted by the Claims Administrator to the Benefits Committee. Thus, the Benefits Committee made its final determination without having all information submitted by the Plaintiff."[7] The district court granted the motion, and the Committee contracted with an independent reviewing agency to have three unaffiliated physicians conduct a new review the administrative record. Each of the three answered seven questions and offered conclusions regarding the extent of Outward's disabilities.

Dr. Jane Kauffman, a cardiologist, concluded, "*from the perspective of cardiovascular medicine*," that Outward "does not have any impairments that would affect her ability to perform *any* occupation from 4/1/14 to the present or any portion of that time period." (Emphasis added.) Dr. Shannon Blackmer, who practices in the area of occupational medicine, identified Outward's

---

[7] The 116 pages of information that had not been submitted to the committee "included several medical reports, a Social Security Administration disability determination, a Vocational Consultation Report, a transcript of a taped interview of Plaintiff by Plaintiff's counsel, and letters from acquaintances of Plaintiff."

impairment as extreme fatiguability. According to Blackmer, "[t]his would not affect her ability to perform *any* occupation from 4/1/14 to the present." (Emphasis added.) Finally, Dr. Rajendra Marwah, a rheumatologist, similarly concluded that "[t]he records submitted do not support *any* functional impairment and this claimant should be able to perform her job duties with no restrictions and limitations for the period 4/1/2014 to the current." (Emphasis added.)

By letter dated January 20, 2017, the Eaton Corporation Health and Welfare Administrative Committee denied Outward's claim after determining "that the medical evidence is inadequate to support the approval of Ms. Outward's appeal for [long-term disability] benefits for the period on or after March 31, 2014." To support its decision, the Committee simply reiterated the findings and conclusions reached by Kauffman, Blackmer, and Marwah in their records review.

The Committee concluded its decision by discounting the relevance of Kathleen Reis's vocational consultation report and the Social Security Administration's finding of disability. According to the Committee, Reis's conclusion that Outward is incapable of "competitive employment" can be discounted because, although the report mentioned numerous restrictions on Outward's abilities, she "does not state that [the claimant is] disabled from any occupation."[8] The Committee also accorded no weight to the Social Security Administration's determination because "[t]he disability standards as utilized by the Social Security Administration differs [sic] from the standard set forth under the [Eaton] Plan."

At the conclusion of the administrative portion of the litigation, both Outward and Eaton sought judgment in their favor based on the evidence in the administrative record. After an extensive recitation of the evidence presented in the matter, the district court held that the Committee's denial of benefits was not arbitrary or capricious, "even if some physicians do not

---

[8] In fact, however, Reis, in bolded type, had stated that "the only vocational conclusion that can be reached is that there are no jobs this individual could sustain."

agree with the plan's conclusion." Also finding no merit to Outward's claims of unconscionability, improper conflict of interest, and breach of fiduciary duty, the district court granted judgment to the defendants and denied Outward's competing motion. Outward now appeals that ruling.

## DISCUSSION

In this appeal, as in most ERISA litigation, "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan at issue." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Although we ordinarily review *de novo* a plan administrator's decision to deny benefits, "if the plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan, we review such decisions under the arbitrary-and-capricious standard." *Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 264 (6th Cir. 2018) (quoting *Firestone*) (internal quotation marks omitted). Moreover, "if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a 'facto[r] in determining whether there is an abuse of discretion.'" *Firestone*, 489 U.S. at 115 (quoting Restatement (Second) of Trusts § 187 cmt. d (Am. Law Inst. 1959)). We review *de novo*, however, "the district court's finding that the administrator's denial was not arbitrary and capricious." *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1064 (6th Cir. 2014) (citations omitted). "In other words, our task is to 'determine if there is any genuine issue of material fact whether the insurance company's decision to deny benefits was arbitrary or capricious.'" *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (quoting *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991)).

There is no dispute in this case that Eaton's plan vested the administrator with the broadest discretion possible. In pertinent part, the Plan provides:

> The Plan Administrator and its delegate . . . shall have the *sole and absolute authority and responsibility for construing and interpreting the provisions of the Plan*, subject to any applicable requirements of law. The Plan Administrator's powers include, but are not limited to, establishing rules and regulations as it deems necessary or proper for the efficient administration of the Plan and for the payment of the cost of coverage or benefits under the Plan, *interpreting the Plan, deciding all questions concerning the eligibility of persons to participate in the Plan, construing any ambiguous provision of the Plan, correcting any defect, supplying any omission and reconciling any inconsistency, in such manner and to such extent as the Plan Administrator, in its discretion, may determine*. Any such action of the Plan Administrator will be binding and conclusive upon all Participants in the Plan.

(Emphases added.)

Although invocation of the arbitrary-and-capricious standard does not, in and of itself, constitute a rubber stamp of the administrator's determination, that decision "must be upheld if it results from a deliberate principled reasoning process and is supported by substantial evidence." *Schwalm v. Guardian Life Ins. Co. of Am.*, 626 F.3d 299, 308 (6th Cir. 2010) (citation and internal quotation marks omitted). In other words, "a court must review the quantity and quality of the medical evidence on each side." *Id.* "When it is possible to offer a reasoned explanation, *based on the evidence*, for a particular outcome, the outcome is not arbitrary or capricious." *Shields v. Reader's Digest Ass'n, Inc.*, 331 F.3d 536, 541 (6th Cir. 2003) (citation omitted) (emphasis added).

**Challenge to the Alleged Change in the Plan's Definition of Disability**

As we noted previously, the Summary Plan Description of the Eaton Disability Plan stated that an employee would be considered to have a covered disability if, due to injury or illness, "[f]ollowing the first 24 months, *you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit* for which you are, or may become, reasonably well fit by reason of education, training or experience—at Eaton or elsewhere." (Emphasis added.) Outward insists, however, that the denial of benefits in her case was improper because Eaton, over time, altered its definition of "any work" to include both full-time and part-time employment. She argues that, although the language of the Plan has not changed, Eaton, for

the first time in *McClain* in 2014, expanded the interpretation of the "any work" language to include part-time work.

In *McClain*, we explained:

Under an arbitrary and capricious standard, honoring the extreme deference due the administrator, we are not convinced it was irrational to have concluded that an ability to work part time does not meet the definition of totally disabled to engage in *any* occupation or perform *any* work for compensation. It is reasonable to conclude that an ability to do some work means one is not unable to do "any work."

*McClain*, 740 F.3d at 1067. Indeed, because the plan document itself gives the Plan Administrator the power not only to interpret the Plan, but also to "constru[e] any ambiguous provision of the Plan," there is little that a beneficiary of the Plan can do to object to that construction.

Moreover, as noted in *McClain*, numerous other federal courts have concluded that the ability of an employee to perform part-time work means that such an individual is not totally disabled from *any* occupation. *Id.* at 1067–68 (citing cases). And, even the cases from various district courts upon which Outward relies in her appellate brief do not support the result she seeks.

Outward contends that three cases in particular—*Leagon v. Eaton Corp.*, No. CA 7:02-898-20, 2003 WL 23532381 (D. S.C. July 18, 2003); *Galm v. Eaton Corp.*, 461 F. Supp. 2d 885 (N.D. Iowa 2006); and *Childers v. Eaton Corp. Long Term Disability Plan*, No. 7:05-1483-RBH, 2008 WL 2699783 (D. S.C. June 30, 2008)—establish that Eaton, at the time of those decisions, did not believe that part-time employment automatically disqualified an individual from receipt of long-term disability benefits. Outward noted that all three cases involved interpretations of language identical to that in the Plan in this appeal, and that in each of those situations, evidence before a plan administrator indicated that the claimants could work on a part-time basis. Thus, Outward argues that if Eaton "had considered part-time work as a means of ineligibility, it would have out-right denied the claim and cited that specific evidence. Instead, [Eaton] continued to review the claim and never discussed the obvious evidence of part-time work."

This argument, however, manifests a basic misreading of the three cited cases. In *Leagon*, for example, far from ignoring evidence that the claimant could tolerate part-time employment, the court noted that a doctor's opinion that Leagon "could do part-time work, then progress to eight hours a day of sedentary work" indicated that the claimant "was not restricted from all work." *Leagon*, 2003 WL 23532381, at *2–3. Similarly, in *Galm*, the court relied in part on the opinion of a rheumatologist in concluding that Galm was not disabled under the terms of the applicable plan. That physician, after listing various restrictions on Galm's future employment, stated that "[s]he may begin such employment in a gradual fashion, working up to an 8-hour day." *Galm*, 461 F. Supp. 2d at 902. And finally, in *Childers*, the district court found that Eaton had a reasonable basis for concluding that the claimant in that case was not disabled when "Plaintiff's general practice physician[ ] states that . . . Plaintiff could work a part-time job. This diagnosis by his own physician establishes that Plaintiff can perform work for compensation, and that no impediments exist which would continuously preclude Plaintiff from the job duties of any occupation for compensation." *Childers*, 2008 WL 2699783, at *7 (citation and parenthetical omitted).

Thus, the claim that Eaton only recently changed its interpretation of the Plan's language to require a denial of long-term disability benefits if a claimant could perform part-time work is not supported by a review of similar challenges to Eaton's denials of claims. Since at least 2003, Eaton plan administrators, and courts reviewing the decisions made by them, have recognized that the requirement that a claimant not be able to perform "any" work before receiving long-term disability benefits means that those individuals must be unable to perform satisfactorily even part-time occupations. This challenge to the Plan Administrator's decision is without merit.

**Denial of Motion for Further Discovery**

Outward filed a motion in district court to be allowed to conduct discovery "in support of [her] claim that [Eaton's] inherent conflict of interest is beyond the norm, and became an excessive factor in their decision making process." She based that claim of extraordinary bias on her belief that Eaton changed its interpretation of the "any work" requirement in order to reduce the number of successful claims for benefits and to save the corporation money. The district court denied the motion, however, ruling that Outward "failed to lay a factual foundation to support a claim for lack of due process or bias." Outward now appeals that denial.

Eaton first contends that we have no jurisdiction to address this allegation of error because Outward's notice of appeal did not designate the district court's discovery ruling as a decision to be appealed. Rule 3(c)(1)(B) of the Federal Rules of Appellate Procedure clearly states that a notice of appeal must "designate the judgment, order, or part thereof being appealed." Although an "appeal from a final judgment draws into question all prior non-final rulings and orders" in a case, *McLaurin v. Fischer*, 768 F.2d 98, 101 (6th Cir. 1985), if the party appealing a district court decision "chooses to designate specific determinations in its notice of appeal, only those determinations may be raised on appeal." *Crawford v. Roane*, 53 F.3d 750, 752 (6th Cir. 1995) (citations omitted).

In her notice of appeal, Outward claimed to be appealing from "the Final Judgment (Findings of Fact and Conclusions of Law)"; however, the actual judgment in this case noted that the district court was ruling only upon the parties' cross-motions for judgment on the administrative record. Moreover, the district court's explanation of its ruling was contained in a filing denominated "Findings of Fact and Conclusions of Law." Thus, it is easy to understand why Eaton would assert that review of the district court's earlier denial of Outward's motion for discovery is not properly before us at this time.

The confusion created by Outward's notice of appeal can be attributed, however, to the form used by the district court that contains boilerplate language along with a blank for the names of all parties taking the appeal. A second blank requests that the party taking the appeal indicate whether the appeal is taken from "(the final judgment) (from an order (describing it))." Although the form offers alternative options for an appellant—asking the appellant to state whether the appeal is from the final judgment or from only a particular court order—it is clear that Outward's counsel thought that the form required him both to state that the appeal was from the final judgment *and* to describe how the district court denominated that judgment.

We have "held that Rule 3(c)(1)(B) is mandatory and jurisdictional, requiring strict obedience even in the face of harsh results." *Bickerstaff v. Lucarelli*, 830 F.3d 388, 402 (6th Cir. 2016) (citation and internal quotation marks omitted). But "[a] mistake in designating the judgment appealed from is not always fatal, so long as the intent to appeal from a specific ruling can fairly be inferred by probing the notice and the other party was not misled or prejudiced." *Sanabria v. United States*, 437 U.S. 54, 67 n.21 (1978). It appears in this case that Outward sought to appeal from the district court's final judgment—including all non-final rulings and orders encompassed within it—and that Eaton has not been prejudiced by the need to defend the discovery ruling. Consequently, "we will entertain arguments on all objections and asserted errors prior to the final disposition of a case if a party indicates in its notice of appeal that it appeals either the final judgment or the final order in the case." *Caudill v. Hollan*, 431 F.3d 900, 906 (6th Cir. 2005).

Because we review decisions in ERISA cases based on the record before the administrator, evidence outside the record generally is not considered by the district court or on appeal. *See Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 164 (6th Cir. 2007). We have recognized an exception to that general rule, however, when "necessary to resolve an ERISA claimant's

procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 618 (6th Cir. 1998) (Gilman, J., concurring). It is true that when, as in this case, "a plan authorizes an administrator both to decide whether an employee is eligible for benefits and to pay those benefits, it creates an apparent conflict of interest." *Cooper*, 486 F.3d at 165 (citation and internal quotation marks omitted). *See also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). That conflict, however, is only one "factor in determining whether the plan administrator has abused its discretion in denying benefits." *Glenn*, 554 U.S. at 108.

Nevertheless, Outward insists that Eaton's conflict of interest in this case "is beyond the norm, and has become an excessive factor in [the decision-making] process." For that reason, she sought additional discovery aimed at proving that Eaton has tolerated "[a] clear shift in the Policy's interpretation" since 2010 resulting in denials of benefit payments by considering part-time employment to be "any work for compensation or profit." As a factual basis for her motion, she highlighted 14 cases dating from as early as 2002 that she claims did not rely on the availability of part-time work to deny long-term disability payments. As we discussed previously, however, the decisions in *Leagon*, *Galm*, and *Childers*, upon which Outward relies most heavily to support her assertion, actually prove that Eaton has, for approximately 15 years before the final administrative denial of Outward's claim, consistently held that a claimant's ability to perform part-time work disqualified that individual from receipt of continued benefits. Thus, Outward indeed has failed to provide a factual basis for her claim of excessive bias. The district court did not err in denying Outward's motion for additional discovery.

**Claim of Breach of Fiduciary Duty**

The administrator of an ERISA plan is a "fiduciary [who] shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). Outward contends, however, that the administrator of Eaton's Plan breached that fiduciary duty by erroneously and unconscionably interpreting the "any work" provision of the Plan to encompass even part-time employment. Thus, she requests:

> That Plaintiff be relieved of Defendants' practice of unconscionable and inequitable interpretations and conduct in connection with it's [sic] interpretation of the Plan, and that the Court enjoin the Defendant from wrongfully interpreting the definition of disability in the Plan and provide clear directions as to Defendants' procedure in determining eligibility in order to ensure equitable relief.

Unfortunately for Outward, her claim alleging a breach of fiduciary duty runs into a roadblock consisting of controlling precedent and her own admission of her goal in raising the issue. In *Varity Corp. v. Howe*, 516 U.S. 489 (1996), the United States Supreme Court recognized that ERISA's civil enforcement provision, 29 U.S.C. § 1132(a), allows multiple types of civil actions to ensure the protections of the legislation, two of which were applicable to the issue then before the Court. Pursuant to the provisions of § 1132(a)(1)(B), a plan participant or beneficiary may bring suit "*to recover benefits due to him under the terms of his plan*, to enforce *his* rights under the terms of the plan, or to clarify *his* rights to future benefits under the terms of the plan." (Emphases added.) Section 1132(a)(3) more broadly allows participants, beneficiaries, or fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

The Court, examining § 1132's "overall structure," noted that the language of § 1132(a)(3)—and another provision not at issue in the case—"creates two 'catchalls,' providing

'appropriate equitable relief' for 'any' statutory violation." *Varity*, 516 U.S. at 512. "[T]hese 'catchall' provisions act as a safety net, offering appropriate equitable relief for injuries caused by violations that [§ 1132] does not elsewhere adequately remedy." *Id.* Thus, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" *Id.* at 515.

Relying on *Varity*, we previously denied a claim for *compensatory damages* for an alleged breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) if the claimant could seek recovery of those monies under § 1132(a)(1)(B). We held in *Wilkins*:

> The Supreme Court clearly limited the applicability of § 1132(a)(3) to beneficiaries who may not avail themselves of § 1132's other remedies. Because § 1132(a)(1)(B) provides a remedy for Wilkins's alleged injury that allows him to bring a lawsuit to challenge the Plan Administrator's denial of benefits to which he believes he is entitled, he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3).

*Wilkins*, 150 F.3d at 615 (citation omitted).

Again, in *Rochow v. Life Insurance Co. of North America*, 780 F.3d 364 (6th Cir. 2015), this court, sitting *en banc*, reaffirmed the restrictive application of 29 U.S.C. § 1132(a)(3). Addressing a plaintiff's claims for both reinstatement of benefits and disgorgement of proceeds due to a breach of fiduciary duty, we explained:

> A claimant can pursue a breach-of-fiduciary-duty claim under [§ 1132(a)(3)] irrespective of the degree of success obtained on a claim for recovery of benefits under [§ 1132(a)(1)(B)] only where the breach of fiduciary duty claim is based on an *injury* separate and distinct from the denial of benefits or where the remedy afforded by Congress under [§ 1132(a)(1)(B)] is otherwise shown to be inadequate.

*Id.* at 372 (citation omitted).

Faced with the holdings in *Varity*, *Wilkins*, and *Rochow*, Outward seeks to save her § 1132(a)(3) breach-of-fiduciary-duty claim by relying for support on our decision in *Hill v. Blue*

*Cross and Blue Shield of Michigan*, 409 F.3d 710 (6th Cir. 2005), in which we allowed the claimants to pursue relief under both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) because their fiduciary-duty claims were not merely "repackaged individual-benefits claims," but rather "claims for breach of fiduciary duty seek[ing] plan-wide injunctive relief, not individual-benefit payments." *Id.* at 718. *Hill* provides no assistance to Outward in this matter, however. Although she claims perfunctorily that her breach-of-fiduciary-duty claim is an effort to change an overly restrictive plan interpretation for the benefit of all beneficiaries, her appellate brief belies such a magnanimous purpose. Indeed, at the same time that she argues that achieving success on her § 1132(a)(3) claim "would result in a remand and cause a 'plan-wide' affect on [Eaton's] administration of the Plan, instead of 'individual-benefit payments,'" she notes that such a result would moot all of her other appellate arguments, "as [Eaton] would be required to essentially 'start over' *and appropriately re-administer [Outward's] claim under the 'any occupation' language of the Plan*." Brief of Appellant at 11–12 (emphasis added). Unwittingly, therefore, Outward admits that the change she seeks is simply and ultimately a re-adjudication of the denial of her claim for benefits. Supreme Court and circuit precedent prohibit just such an effort.

**Claim of Unconscionability**

As part of her claim for injunctive relief under § 1132(a)(3), Outward contends that Eaton's interpretation of its Plan that forecloses continuation of benefits if a claimant can perform at least part-time work is unconscionable under principles of Ohio law. Specifically, she asserts that upholding the alleged reinterpretation of the "any work" provision of the Plan would result in Outward's monthly income being reduced by approximately 90%. Without a doubt, beneficiaries under the Eaton Plan will experience drastic reductions in their income by being forced into part-time, lower-income employment. Indeed, if the draconian nature of the company's disability plan

were made clear to prospective employees, it is hard to imagine qualified individuals choosing to accept employment with Eaton. Nevertheless, this claim must fail for two reasons.

First, the Supreme Court has held that "any state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted." *Aetna Health, Inc. v. Davila*, 542 U.S. 200, 209 (2004). We too have stated that "[t]he purpose of ERISA preemption was to avoid conflicting federal and state regulation and to create a nationally uniform administration of employee benefit plans. Thus, ERISA preempts state laws that . . . provide alternate enforcement mechanisms." *Penny/Ohlmann/Nieman, Inc. v. Miami Valley Pension Corp.*, 399 F.3d 692, 698 (6th Cir. 2005) (citation and internal quotation marks omitted).

Despite Outward's arguments to the contrary, her claim of unconscionability is nothing more than an effort to have the denial of her benefits re-evaluated. In fact, in arguing that such a result is *not* her aim, she subtly undermines that contention by stating that she "could not receive benefits through this claim, *as it must be remanded for a new review by [Eaton]*." (Emphasis added.) Of course, "a new review" of her claim under state law is merely another way to challenge the earlier determination of her eligibility for benefits—exactly the type of "alternate enforcement mechanism" that ERISA preempts.

Second, even if we were to conclude that the claim of unconscionability is not preempted, we could not find Eaton's definition of the term "disability" unconscionable, despite its injurious effects. To the extent that Outward argues that Eaton's interpretation of the "any work" language of the Plan is improper, that assertion has been undermined by this court's precedential opinion in *McClain*. *See McClain*, 740 F.3d at 1067–68. And, as discussed previously, any contention that

the change in interpretation is a recent phenomenon is simply incorrect. This claim by Outward thus also is without merit.

**Challenge to the Decision of the Administrator Denying Continued Benefits**

In posing her substantive challenge to the denial of benefits, Outward must overcome the heavy burden placed on her by case law describing the deference to be accorded a decision-maker under the arbitrary-and-capricious standard of review. Because such review is "extremely deferential," *McClain*, 740 F.3d at 1064 (citations omitted), a plan administrator's decision must be upheld, even in the face of contrary medical evidence, as long as it is reasoned and based upon the evidence in the record. *Shields*, 331 F.3d at 541. Even so, "[d]eferential review is not no review and deference need not be abject." *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003) (citation and internal quotation marks omitted). "Our task at all events is to 'review the quantity and quality of the medical evidence and the opinions on *both sides* of the issues.'" *Moon v. Unum Provident Corp.*, 405 F.3d 373, 379 (6th Cir. 2005) (emphasis added) (quoting *McDonald*, 347 F.3d at 172).

Here, the Plan Administrator denied Outward's request for continued long-term disability benefits despite noting that some physicians—including Outward's treating physician—found the claimant to be totally disabled and unable to perform even part-time work. The Plan Administrator discounted those opinions supporting a grant of benefits, however, concluding that the diagnoses of disabling conditions were not supported by what the Plan Administrator considered objective medical findings. It is this rationale for its decision and the failure to consider the quality of certain contrary evidence that makes the administrative finding arbitrary and capricious.

Eaton's Plan does require a claimant to provide *objective* findings of a disability. Although the Plan provides that "objective findings" do not include a claimant's description of her

own symptoms, they do include—in addition to x-ray and diagnostic test results—findings from physical exams, diagnoses, observation of abnormalities, medications, and treatment plans. Outward presented voluminous evidence of her restrictions through the diagnoses from her treating physician, through the findings from physical exams, through doctors' observations of her diminished capacities, and through the medications and treatment plans prescribed for her. Of course, in order to make those diagnoses and prescribe medications and treatment plans, physicians had to rely in part upon the patient's own description of her condition, but such information is essential to providing proper medical care to any patient. Indeed, to ignore such proffered information would constitute medical malpractice.

Furthermore, as we noted in *Corey v. Sedgwick Claims Management Services, Inc.*, 858 F.3d 1024 (6th Cir. 2017)—a case reversing a denial of benefits under the same Eaton Plan at issue here—reliance on test results only is no more predictive of an ability to perform certain work than is reliance on diagnoses, prescriptions, treatment plans, and other medical evidence. As we explained in that case:

> An illustration from the Administrator's brief illustrates how its interpretation here does not fit with the plan's other examples:
>
>> For example, a prescribed regimen of pain medication may serve to indicate the existence of a back condition. Standing alone, however, the prescription of such medication does not indicate that one is unable to work for a period of time because of the condition. Indeed, some individuals experiencing back pain are readily able to continue work.
>
> But an x-ray showing nerve compression suffers from the same defect: it bespeaks the existence of a back condition, but doesn't demonstrate whether the condition prevents the employee from working. So too with every other example in the plan.

*Id.* at 1028.

Here, as in *Corey*, the Plan Administrator cavalierly dismissed all evidence of the employee's disabling conditions by claiming simply that no specific test results buoyed the

diagnoses supporting the claim of disability. Such a dismissal by the Plan Administrator was inappropriate.

First, Outward's treating physician listed all the test results, observations, treatment plans, and prescribed medications that supported the diagnoses of joint hypermobility syndrome and postural orthostatic tachycardia syndrome. Specifically, she referenced the following facts: Outward received a Beighton score of 6/9; the patient was observed with muscle tightness and abnormal responses to therapy massages and exercises; she had elevated blood pressure readings; QSART findings confirmed small fiber neuropathy and failure of the sweat test; hemodynamic testing indicated "problems with standing and sitting towards fainting and showed anemia"; Outward required prescriptions for Adderall and Natazia to improve concentration and reduce blood flow during menstruation; and she required pain medication and Fludrocortisone to manage her symptoms, even though such medication did not eliminate the problems Outward faced.

These facts should have been considered by the Plan Administrator in this case along with other so-called quantitative testing to evaluate properly the extent to which Outward was disabled. Because the opinion of Outward's treating physician was based on test results, treatments, and observations conducted and made over the course of many years—in contrast to the opinions of doctors who merely reviewed records or examined the claimant during a single brief visit—the Plan Administrator should not have dismissed Dr. Corey's conclusion simply because certain *other* substantive findings were not included. *See, e.g.*, *Shaw v. AT&T Umbrella Benefit Plan No. 1*, 795 F.3d 538, 548 (6th Cir. 2015) (plan erred in ignoring favorable evidence from claimant's treating physician when medical records provided evidence of impairment).

Second, when evaluating whether disabling conditions are present and whether certain treatments are appropriate, the information provided by a patient is of the utmost importance and

relevance in determining the *quality* of any supporting documentation. Thus, although subjective complaints, by themselves, cannot support a finding of disability, such complaints that form the rationale for objective medical testing and treatment should be given credence. In this case, however, the Plan Administrator arbitrarily and capriciously failed to take into account in his determination, the fact that certain disabilities cannot be proven solely by objective tests and that Outward became so fatigued by minimal exertion that she could not perform certain portions of tests, that she required lengthy rest periods before continuing with testing, that she was not able to perform even daily-hygiene and personal-care activities without lying prone for hours—if not days—and that she would be required to be absent from any job for five days each week due to her physical condition and her inability to sustain concentration. As Dr. Corey stated perceptively, in determining disability, a decision-maker must look at the whole picture, not just one test or one office visit. The Plan Administrator's reliance on the medical opinions of doctors who fell into the trap of relying only upon cherry-picked evidence provides additional support for our conclusion that the decision denying long-term disability benefits was arbitrary and capricious.

The Plan Administrator's final decision relied almost exclusively on the independent review of medical records conducted by Drs. Kauffman, Blackmer, and Marwah. Those doctors recognized that Outward exhibited multiple symptoms frequently seen in patients with POTS, that she suffered from extreme fatigability that cannot be verified by objective medical testing, and that she complained of "dizziness and fatigue and vague sensations of numbness over the face and extremities." Because no specific test could validate those conditions, however, each of the reviewing doctors and the Plan Administrator concluded that Outward had absolutely no restrictions that would prevent her from performing any job. Such conclusions show clearly how unreasonable it is to rely solely upon only certain objective findings—to the exclusion of other

listed, acceptable, objective findings—in determining eligibility for receipt of benefits. Again, as we recognized in *Corey*, blind reliance on the results of certain medical tests often skews the true picture of an individual's condition and ability to perform jobs within the economy. Here, although the tests upon which certain reviewers relied did not produce the results that *they* would have liked to see, other objective diagnoses and treatments showed that any expectation that Outward could perform any job without limitation or restriction was unprincipled, unreasoned, and contrary to the evidence in the record.

The Plan Administrator and Eaton contend that the denial of continued benefits is proper because reviewing physicians—specifically Kaufmann, Blackmer, and Marwah—offered "reasoned" explanations for why certain test results did not support Outward's claim of disability. Although the medical testimony upon which Eaton relies indeed does offer reasons why specific tests did not meet chosen criteria, reliance on *only* such test results in reaching a conclusion is itself the definition of arbitrary and capricious. Even the Plan's own language directs evaluators to consider information besides test results in determining eligibility for benefits. The failure of Kaufmann, Blackmer, and Marwah to do so, and the failure of the Plan Administrator to recognize that decisional deficiency dooms any reliance on their opinions in reaching an ultimate determination in this matter. Moreover, Outward's treating physician explained that given the unique nature of the intertwined, progressive conditions from which Outward suffered, "[t]here is not a MRI, CT scan, X-ray, blood test, or DNA test that objectively proves the diagnoses."

By concluding that Outward was not entitled to continued long-term disability benefits, the Plan Administrator gave great weight to the opinions of medical professionals who relied only on such tests and who could provide only a snapshot of Outward's condition at certain points in time. In doing so, he necessarily discounted evidence offered by Outward's treating physician and other

professionals that provided a broader, more holistic, more complete picture of Outward's situation. In short, the Plan Administrator, operating under an inherent conflict of interest, failed to consider *all* relevant evidence of Outward's condition and her functional capacity. Such a failure thus calls into question the validity of the administrative decision, even under the deferential arbitrary-and-capricious standard of review.

## CONCLUSION

We find no merit to Outward's challenge to the Plan's definition of "disability" or to her claims of breach of fiduciary duty, unconscionability, and improper denial of her motion for additional discovery. But because the Plan Administrator failed to give appropriate consideration to all evidence supporting Outward's claim of disability, we have no choice but to conclude that the administrative denial of benefits was arbitrary and capricious. We therefore REVERSE the decision of the district court upholding that determination and REMAND the matter to the district court with instructions to return the case to the Plan Administrator for a full and fair review of all relevant evidence in accordance with the Plan's own definition of acceptable, objective medical findings.

GRIFFIN, Circuit Judge, concurring in part and dissenting in part.

Although I join the majority opinion regarding the first four issues, I respectfully disagree that the plan administrator's denial of continued long-term disability benefits was arbitrary and capricious. My colleagues remand to the plan administrator for reconsideration of plaintiff Teresa Outward's application for benefits, and more specifically, "to consider *all* relevant evidence of Outward's condition and her functional capacity." This is because they view the administrator's decision as relying on cherry-picked medical tests and ignoring plaintiff's submitted medical evidence that they contend reflects a covered disability. I do not read the denial of benefits letter in the manner as characterized by the majority opinion. On the contrary, in my view, it considers all the relevant evidence before making a well-reasoned decision to deny benefits. I therefore would affirm the district court's judgment and thus dissent in part.

When, as here, a plan administrator is given the discretionary authority to determine eligibility for benefits, "we review the administrator's decision to deny benefits using the highly deferential arbitrary and capricious standard of review." *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (internal quotation marks omitted). "This standard is the least demanding form of judicial review of administrative action. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary and capricious." *Id.* (alterations and internal quotation marks omitted). Consequently, a decision will be upheld "if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." *Id.* (internal quotation marks omitted). "[T]he ultimate issue in an ERISA denial of benefits case is not whether discrete acts by the plan administrator are arbitrary and capricious but whether its ultimate decision denying benefits was arbitrary and capricious." *Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 362 (6th Cir. 2002).

"[C]omplete consensus is not required to establish a reasoned basis for an administrative decision." *Univ. Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 847 (6th Cir. 2000). "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." *Evans v. UnumProvident Corp.*, 434 F.3d 866, 877 (6th Cir. 2006) (citation omitted). Plan administrators need not defer to treating physicians, *see Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832–34 (2003), but must "give reasons for adopting an alternative opinion," *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 620 (6th Cir. 2006); *see also Balmert v. Reliance Standard Life Ins. Co.*, 601 F.3d 497, 504 (6th Cir. 2010) ("Reliance on other physicians is reasonable so long as the administrator does not totally ignore the treating physician's opinions.").

In my view, the plan administrator's decision to deny benefits was not arbitrary and capricious. It reviewed the "whole of the administrative record," including plaintiff's treating physicians' records and independent doctors' assessments. *McClain v. Eaton Corp. Disability Plan*, 740 F.3d 1059, 1066 (6th Cir. 2014). And those other doctors provided the plan administrator with ample reasons to discredit plaintiff's treating physicians.

Consider the final decision's discussion of Dr. Jane Kauffman's independent review. It details her criticism of the "objective" evidence relied upon by plaintiff's treating physicians:

> While she has shown multiple symptoms and some of them are frequently seen in POTS, the crucial piece of information missing was the lack of any evidence of postural orthostatic tachycardia proven by an objective medical test. *For example, Dr. Kaufmann pointed out that the results of the tilt table test were inconsistent.* While there were two short episodes of heart rate of 97 BPM (her baseline 66 BPM), results were not sustained. In order to meet the criteria for POTS, Dr. Kauffman noted that tachycardia should persist for 10 minutes after standing up. There were 3 orthostatic measurements set forth in your client's treatment summary: 2 in the

office of Dr. Grubb and 1 in the office of her primary physician. *As noted by Dr. Kauffman all 3 measurements did not reveal POTS and the blood volume measurements did not reveal reduced blood volume. Thus, Dr. Kauffman noted that based upon the submitted medical records, the claimant did not have a continued diagnosis of POTS.* Further, from a cardiovascular point of view, her functional capacity could not be limited in the absence of any cardiovascular diagnosis. In her report, Dr. Kauffman stated that she disagrees with the POTS diagnosis as made by Dr. Grubb.

The reviewer further notes that the patient is on multiple medications, however, *there was no evidence that these medications would prevent her from performing her occupation.* There is no documentation supporting the patient experienced side effects from the prescription medication. She had elevated blood pressure on several occasions in 2014 and 2015 and this is noted in the treatment summary (it was not addressed in progress notes). Dr. Kaufmann pointed out that fludrocortisone could cause blood pressure elevation and the same can be said with salt tablets; however, *it cannot be proven that her blood pressure elevation was caused by these medications.* Further, the use of Adderall XL can result in certain side effects including agitation, palpitations, insomnia and dizziness; however, it is difficult to ascribe these symptoms to Adderall because claimant had them before she start taking this medication.

(Emphasis added).

Another reviewer, Dr. Rajendra Marwah, concurred. He too disagreed with Dr. Corey's POTS diagnosis as "not supported by the orthostatic blood pressure testing results." Dr. Marwah was similarly skeptical of Dr. Corey's Ehlers-Danlos Syndrome diagnosis, writing that while Outward's "treating physicians indicated a possible existence of Ehlers Danlos Hypermobility Syndrome III, there was no evidence of skin hyperextensibility on physical examinations and the patient had no family history of this disorder." Dr. Marwah further criticized Dr. Corey's methodology. She "never documented supine and standing [blood pressure] and pulse changes in all of her encounters with" Outward and did not consider that the QSART's "borderline positive" results should have been "excluded on the basis of a skin biopsy."

This preceding record demonstrates that the plan administrator considered all the evidence and then offered a "reasoned explanation" as to why it chose to rely on the medical opinion of several doctors over those of plaintiff's treating physicians. That is all that was required. *Id.* In

my view, the record establishes that the plan administrator's decision reasonably considered and rejected the evidence of plaintiff's treating physicians.

In its holding to the contrary, the majority opinion relies upon a recent decision that involved the same ERISA plan, *Corey v. Sedgwick Claims Management Services, Inc.*, 858 F.3d 1024 (6th Cir. 2017). There, we found the plan administrator acted arbitrarily and capriciously when it rejected the plaintiff's application for disability benefits "due to a lack of objective findings." *Id.* at 1027. But the parallel extends no further. The plaintiff in *Corey* submitted medications and a treatment plan as an example of objective medical evidence, but "[n]either the Administrator nor the independent examiners discussed whether [they] . . . substantiated" his claimed disability. *Id.* Most importantly, the defendant "never explained why his medications and treatment plan failed to satisfy the plan's objective-findings definition. Nor did its rejection letters offer any other explanation for the benefits denial." *Id.* at 1028. Here, by contrast, we deal not with a plan administrator *ignoring* objective evidence, but instead with one *discounting* objective evidence with a reasoned explanation. Thus *Corey* is readily distinguishable.

For these reasons, I respectfully concur in part and dissent in part. I would affirm the judgment of the district court.